UNITED STATES of America, Appellee,

v.

James D. PIERCE and Patrick A. Lanning, Defendants, Appellants.

UNITED STATES of America, Appellee,

v.

Carlos A. GUERRERO, Defendant, Appellant.

Nos. 79–1086, 79–1087.

United States Court of Appeals, First Circuit.

Argued March 1, 1979.

Decided March 5, 1979.

Donald L. Ferguson and Harold F. Keefe, Asst. U. S. Atty., Miami, Fla., for defendants, appellants Pierce and Lanning.

Roxana Marchosky, Boston, Mass., by appointment of the Court, for defendant, appellant Guerrero.

Walter B. Prince, Asst. U. S. Atty., Boston, Mass. with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before ALDRICH, Senior Circuit Judge, CAMPBELL and BOWNES, Circuit Judges.

ALDRICH, Senior Circuit Judge.

As the result of the Coast Guard's finding 34 tons of marijuana in the hold of a vessel boarded 55 miles off the Massachusetts coast, defendants were indicted for conspiracy to import a controlled substance. An anticipated defense was severely punctured by documents found in an allegedly locked valise which the Coast Guard had opened without a warrant. After the jury was impaneled it was sent to its room while the court took testimony and heard arguments on a motion to suppress the documents. It first concluded that it would deny the motion, but later expressed doubts, and instructed government counsel not to refer to the valise in his opening, and said it would pass finally on the motion later. The trial then proceeded. The next morning a juror reported to the clerk that, during the hearing from which the jury had been excluded, they had gone to the cafeteria; that the marshal had permitted the husband of one of the jurors to join them, and that the husband had been in the courtroom and had spoken to some of the jurors about what had gone on. The clerk informed the court, and the court called counsel to the lobby. In consequence of what there transpired the court declared a mistrial over the objection of at least two of the three defendants. Thereafter, the court having, meanwhile, denied the motion to suppress, defendants objected to the impaneling of a new jury on the ground of double jeopardy. The court denied their motion, and because one defendant was in jail and eight crew members were in protective custody, we proceeded promptly with these appeals.

At the outset of the lobby conference counsel for one of the defendants had requested that the court first decide the motion to suppress in order to determine the amount of taint, and be of help to defendants in deciding whether to waive any claim of prejudice. The court declined, responding that it did not appear to it to make any difference. It then called, seriatim, four jurors. The first, Mrs. Weiner, who had reported the incident to the clerk, testified that Mrs. Priest, another juror, had told her that the husband of a further juror had been sitting in the courtroom during a hearing and had reported thereon. "The words I had received . . . [were] that the attorneys were trying to work something out with the Judge and he wasn't buying it. . . . [His account] passed to everybody very quickly, once everybody got down there . . . it passed through everyone very quickly." Mrs. Priest testified that a juror (Mrs. LaJoie) stated to her that another juror had told her, following lunch, that her husband had been in the courtroom and had told her "something about they may be going to dismiss it." Mrs. LaJoie, in turn, corroborated this, testifying that "all he said" was "something to the effect that they were trying to dismiss the case." Finally, Mrs. Shoemaker testified that her husband "went down to coffee and . . lunch . . . [;] [that] we were talking about sitting upstairs for three hours and he said he thought it was they were trying to get a piece of evidence not to be brought up in the case . . . .. I think . . . it was a valise, or something. I don't know. And I am not positive but I think he said they weren't going to have it shown, but I really don't remember because we were talking about buying our house and everything . . . .." She stated that the juror who at last testified was present; that she could not remember if anyone else was.

After Mrs. Shoemaker left, the court stated that it did not see any alternative except to declare a mistrial. This, however, was not a definite ruling. The court invited counsel to put whatever they wanted in the record. Two of the three replied that they particularly liked this jury. The court then stated that it would not go ahead with the trial without the defendants' written consent; that it was not perhaps possible to ask them to decide this question, "plus the fact that I am a little more confident in what Mrs. Weiner had to say about this circulating throughout the jury very quickly . . . sitting down and their talking about it and . . . this thing got through very fast."

The court did not define what it meant by "this thing." Obviously, there was more

than one account; that the defendants were seeking to exclude a valise; that they were trying to get the case dismissed, and Mrs. Weiner's statement that they were trying to work something out but the court would not buy it. This last, we regard as broad enough to encompass excluding evidence, or bargaining about a plea.

After the court's volunteering that it would not try the case jury waived, court and counsel returned to the courtroom without more ado and the court formally discharged the jury. Thereafter counsel for all defendants stated that they would have preferred to go through with the trial,[1] to which the court responded that it took the responsibility "because I felt it was necessary under the circumstances."

In its order, made later when it denied defendants' plea of double jeopardy,[2] the court commenced by stating that the jury had been instructed not to discuss the case among themselves or with anyone else. It summarized what we have already quoted, and then recited,

"The Court concluded that the jury had been tainted and declared a mistrial . . . .. No reasonable alternative solution was available. At least four of the jurors had been directly involved and there were only two alternates.

"At the same time, the Court's ruling on the motion to suppress was as yet undecided. The matters concerned in the motion to suppress already had been communicated to the jury and the jury could engage in speculation in what that material was or what the lawyers were trying to accomplish. At the same time, there was no substantial hardship to any of the defendants so far as time was concerned. The indictment had been returned January 19th and a new trial date was scheduled for February 22, 1979. There had not been substantial evidence produced at the trial and no evidence which would reveal a defense strategy or defense testimony had been produced. The incident had not been provoked or caused by any actions of the government."

■ In view of the Supreme Court's constant insistence that a mistrial is to be ordered, over a defendant's objection, only upon a showing of "manifest necessity," or a "high degree" of necessity, e. g., *Arizona v. Washington*, 1978, 434 U.S. 497, 506–06, 98 S.Ct. 824, 54 L.Ed.2d 717; *United States v. Jorn*, 1971, 400 U.S. 470, 487, 91 S.Ct. 547, 27 L.Ed.2d 543; *Downum v. United States*, 1963, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100; *United States v. Perez*, 1824, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165, our first inquiry must be whether the court gave adequate consideration to the existence of any less drastic alternative. *See United States v. Jorn*, ante, 400 U.S., at 487, 91 S.Ct. 547; *United States v. McKoy*, 3 Cir., 1979, 591 F.2d 218, 222; *Dunkerley v. Hogan*, 2 Cir., 1978, 579 F.2d 141, 146–48; *United States v. Starling*, 5 Cir., 1978, 571 F.2d 934, 941 & n.10; *cf. Arizona v. Washington*, ante, 434 U.S., at 515–17 & n.39, 98 S.Ct. 824. We have no reason to reject the court's acceptance, without further inquiry, of Mrs. Weiner's testimony that other jurors, in addition to the four already questioned, had received some account. For present purposes, we will assume that it may have been Mrs. Weiner's account rather than that of the other three jurors questioned. The issue then becomes whether this produced an ineradicable taint, or whether the court could have taken some action, short of discharging the jury, to defuse any prejudice.

We agree with the court that discharge of certain jurors was an insufficient option, there being only two alternates. The matter to be considered is the possibility of curative instructions. On this issue the court gave counsel no opportunity to be heard, except to express their opinion that it would make a difference how the motion

---

1. Two of the three had maintained this from the outset, offering to file waivers executed by their clients. The third was less willing, but wished to discuss the matter with his client. This opportunity was not given him.

2. By this time the court had finally denied defendants' motion to suppress the valise.

to suppress were to be decided. The court's disagreement with that conclusion we cannot accept. Rather, this seems the nub of the question. If the jurors were to know that the court, on motion of the defendants, had excluded the contents of the valise, to tell them to forget it would seem like the classic example of telling a child to sit in the corner and not think about elephants. There would be grave danger that the jury would constantly be wondering what the damaging evidence was. On the other hand, if the ruling were that the evidence was to be admitted, one must ask how defendants were prejudiced merely by antecedent knowledge that the defendants had sought its exclusion. Evidence is introduced every day over a defendant's objection in open court. The only difference here would be that the jury would know that the objections had been presented earlier, and had required extensive consideration before the court made up its mind. We can see no prejudice of any consequence in this.

Nor can we see prejudice in the jurors' learning, if this is what they thought, that the defendants had made an unsuccessful attempt to have the indictment dismissed. Any defendant, innocent as well as guilty, would move to have an indictment dismissed if he believed there was reason to do so. The fact that he failed means no more than does the fact that the grand jury had indicted him in the first place—a matter a court routinely instructs the jury must carry no weight in its deliberations. Furthermore, since this was not the basis of the hearing, the court could properly instruct the jury that, to the extent that any of them had so believed, they were mistaken. We see no possible prejudice.

We are more troubled by Mrs. Weiner's understanding that the defendants were "trying to work something out." Unlike unsuccessful evidentiary motions, we would be greatly disturbed if it should remain in the minds of a jury that a defendant had made an unsuccessful attempt to plead. However, we believe this, too, was curable. The record was such that the court, with full accuracy, could have instructed the jury

that the sole matter under consideration was a ruling on evidence; that if any jurors had thought otherwise, they were mistaken, but that it was a difficult question and the court had had to proceed in their absence because, if the evidence were to be excluded, obviously they should not know about it. The court could have added that it was fortunate that their failure to follow its instructions about not communicating with third parties did not, in this instance, have any consequence, except a very proper report from a juror who had remembered these instructions better than some others had; that it would be better if the husband did not return to the courtroom, and there must be no more violations in any event. We would then feel that all taint had been removed. Were there any doubt on this score—and we see none—certainly the taint would be sufficiently diminished to allow the court to accept defendants' proffer of a waiver.

As against this, the government cites *Killilea v. United States*, 1 Cir., 1961, 287 F.2d 212, *cert. denied*, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259, a case which involved a similar situation of a juror's spouse, there a wife, reporting to the juror, as a result of courtroom exposure, events occurring in the courtroom while the jury had been excluded. We held there that the mistrial had been properly declared, and that the defendant could not claim double jeopardy. There are, however, great factual differences between *Killilea* and the case at bar. The discovery of the wife's communications occurred after ten days of trial, during most of which time the wife had sat in the courtroom. "It was common agreement that, throughout the trial, many significant matters which the jury should not have heard had taken place in open court with the jury excluded, but within the hearing of spectators." *Id.* at 213. Upon examination in the lobby, the wife "stated that she had . . . heard many of the matters which transpired during the jury's absence, and, in general, had discussed these matters with her husband. She also stated that she had told her husband what she thought of the

testimony and of the witnesses." *Id.* at 214.[3]

This is an area where every case must stand upon its own bottom. *Illinois v. Somerville,* 1973, 410 U.S. 458, 465, 93 S.Ct. 1066, 35 L.Ed.2d 425, quoting *Downum v. United States,* ante, 372 U.S., at 737, 83 S.Ct. 1033. In terms of remedial action, *Killilea,* given the extended course of improper communication of prejudicial matter, is at the opposite end of the spectrum from the case at bar.

█ The constitutional right of a defendant not to be twice put to the bar against his will is entitled to the deepest respect. At the same time, we recognize broad discretion in the district court to determine that a jury has been prejudiced beyond repair, and we would not overturn a supported and reasoned exercise of discretion even if, on the basis of 20–20 hindsight, we might have reached the opposite conclusion. We appreciate that the court here was presented with a very troublesome situation, particularly when, we are informed, it had gone to great lengths the previous day to obtain a jury free of any possible influences. However, we cannot feel that the record warrants the court's action. In this circumstance it is no answer that, in the court's opinion, the defendants were not prejudiced by aborting the trial. *See Illinois v. Somerville,* ante, 410 U.S., at 471, 93 S.Ct. 1066. The court stated that no defendants' witness had testified. Leaving aside defendants' assertion that two of the government's witnesses who had testified had proved helpful to them on cross-examination,[4] this was not the test. Defendants' claim from the outset was a liking for this particular jury. Even absent other forms of prejudice, a defendant's "valued right to have his trial completed by a particular

tribunal," *United States v. Jorn,* ante, 400 U.S., at 484, quoting *Wade v. Hunter,* 1949, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974, is not to be foreclosed "until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *United States v. Jorn,* ante, 400 U.S., at 485, 91 S.Ct. at 557; *see Mizell v. Attorney General,* 2 Cir., 1978, 586 F.2d 942 (mistrial declared immediately after impaneling.)

█ We comment briefly upon the basic circumstance that the jury, in talking to the husband and spreading his report, violated the court's instructions not to communicate with outsiders about the case. We can imagine that in flagrant cases, even if no information of a prejudicial nature was acquired, a judge might lose confidence in the jury's integrity and responsibility. The court, however, did not make such a finding in this case, or purport to act upon one. If it had directed inquiry to this subject, appraised the jurors, heard counsel and made such a finding, we might, in light of the deference due it, *Arizona v. Washington,* ante, 434 U.S., at 510–11, 98 S.Ct. 824 have concluded such action to be within its discretion. However, the court cannot be permitted to do this without first affording counsel an opportunity to be heard, and making a record which adequately discloses the basis of its decision. *See, e. g., Arizona v. Washington,* ante, at 515–17 & n.39, 98 S.Ct. 824; *United States v. Jorn,* ante, 400 U.S., at 487, 91 S.Ct. 547; *Dunkerley v. Hogan,* ante, at 146 & n.5. It is true that in *Killilea* we stated that "[a] court might well conclude that such a jury ought not to sit." 287 F.2d at 215. This was a mere observation, and was neither the ground of the district court's decision, nor of our own. If this statement be read as meaning that the

---

3. The court assumed "that if the juror should deny communication with the other jurors it would have to feel that such denial was prompted by a desire to protect himself, since inquiry of the juror would indicate that 'he had been disobeying my mandate' and 'obviously he is going to rush to his own defense.' " 287 F.2d at 213. On the facts of that case we did not quarrel with that assumption.

4. *See Arizona v. Washington,* ante, 434 U.S., at 504, & n.14, 98 S.Ct. 824, quoting *Carsey v. United States,* 1967, 129 U.S.App.D.C. 205, 208–209, 392 F.2d 810, 813–14 (Leventhal, J., concurring).

court need not make a record, we hereby modify it. Nor, parenthetically, does it appear that the district court so read it. Instead, the court placed its reliance upon a taint resulting from what the jurors had learned. Since we conclude that this taint would become insignificant upon a decision to admit the evidence and appropriate instructions, there was insufficient basis to warrant the drastic remedy of declaring a mistrial, and the appeal must be allowed. The defendants are to be discharged.