COMMONWEALTH vs. WILLIAM G. REINSTEIN.

Suffolk.  May 29, 1980. — September 9, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, & ABRAMS, JJ.

*Practice, Criminal,* Mistrial.  *Constitutional Law,* Double jeopardy.

A defendant was not entitled to a dismissal of indictments against him
   on double jeopardy grounds where the judge's declaration of a mistri-
   al, over the defendant's objection, was a matter of manifest necessity
   arising in part from the defendant's vigorous opposition to sequestra-
   tion of the jury and the subsequent publicity generated by the defend-
   ant's family and friends. [556-562]

INDICTMENTS found and returned in the Superior Court
on December 2, 1976.

A motion to dismiss was heard by *Lynch,* J., and a ques-
tion of law was reported by him to the Appeals Court. The
Supreme Judicial Court granted a request for direct review.

*Richard B. Michaud* for the defendant.

*Roger A. Emanuelson,* Special Assistant District Attorney
(*Margaret A. Corrigan,* Assistant District Attorney, with
him) for the Commonwealth.

WILKINS, J.  Following the declaration of a mistrial in a
proceeding involving charges of conspiracy and perjury, the
defendant, a former mayor of the city of Revere, moved to
dismiss the indictments, asserting that a retrial would vio-
late his rights under the double jeopardy clause of the Fifth
Amendment to the Constitution of the United States. The
trial judge denied that motion and reported to the Appeals
Court the propriety of his action.[1]  We granted the

---

[1] The question reported is: "Was the court correct in its denial of the
defendant's motion to dismiss Indictment Nos. 06190 and 06204 on the
ground that further prosecution thereof would violate the defendant's

Commonwealth's application for direct appellate review. We conclude that double jeopardy principles under the Fifth Amendment do not bar a retrial of the defendant and answer the reported question in the affirmative.[2]

On November 30, 1979, the second day of the taking of testimony, the prosecutor brought to the judge's attention a full page advertisement that had been published in a weekly television magazine distributed "throughout Revere, Winthrop, Chelsea and East Boston" for the week commencing December 2, 1979. The advertisement, portions of which were read into the record by the judge, as set forth in the margin,[3] sug-

---

rights under the double jeopardy clause of the Fifth Amendment of the United States Constitution and the decisions of The Supreme Judicial Court?"

[2] No question is raised concerning double jeopardy principles under the common law of the Commonwealth or under provisions of the Constitution of the Commonwealth. See *Lydon* v. *Commonwealth, ante* 356, 366 (1980). No such question appears to have been presented to the trial judge.

[3] THE JUDGE: "Looking at it, it contains the usual daytime and evening listings of television programs, and on Page 13 there is a sheet, full page, headed, 'Is Reinstein being framed?' Underneath in large letters, 'Why,' with three question marks. It goes on to say, 'If those in power are trampling on Reinstein's rights today, tomorrow they can trample on yours.' It contains in the middle of the page what appears to be a copy of a letter dated June 25, 1979 to the District Attorney for Suffolk County, Mr. Newman Flanagan and purports to bear the signature of one Simon Sharigian and the typed signature underneath it, 'Mr. Simon Sharigian, (Prosecution Witness).' Following the reproduction of that letter, which shows a date stamp on top — it's on the letterhead of Design Group, Ltd. — there is further text which reads as follows: 'This letter was received by the District Attorney's office July 5, 1979. Mr. Simon Sharigian passed away August 30, 1979. Why did no one in authority contact Mr. Sharigian from the date of receipt of this letter on July 5, 1979 until his death,' three question marks.

"'On the basis of the above letter — why a new trial,' three question marks.

"'Is the trial of Bill Reinstein a proper administration of justice or a political vendetta,' three question marks.

"'Correct this miscarriage of justice. Contact responsible authorities and STOP' — capital letters for stop — 'this harassment.'

"'The system . . . Once in a while someone has the courage to fight back. Ask Bill Reinstein.'

"At the bottom appears, 'Sponsored by the Committee for Human Rights.'"

gested that the defendant had been "framed," that his rights had been trampled on, and that the district attorney was engaged in a political vendetta. The publication was free, and some 5,000 copies had been available for as long as three days when it was brought to the judge's attention. Three of the sixteen jurors came from the area of distribution of the publication.

The advertisement stated that it was sponsored by "The Committee for Human Rights." The defendant admits that the advertisement was the product of efforts of members of his family and friends, and that, prior to the commencement of trial, he personally had disseminated material similar to the advertisement. However, the judge accepted the defendant's representation that he was not responsible for the publication of this particular advertisement.

Although the Commonwealth had initially requested that the jury be sequestered, anticipating a publicity problem in light of prior publications of the letter quoted in the advertisement, the defendant had vigorously opposed the sequestration of the jury. In the course of the pretrial discussion of the question of sequestration, the defendant agreed to maintain complete, public silence during the course of his trial and "to request in the strongest of terms that the committee refrain, on the same basis as he will refrain, from any activity, [oral] or written in connection with this matter until it is concluded." The judge noted that a mistrial might be required if the defendant presented prejudicial publicity.

In apparent reliance on these representations and the anticipated consequences of the defendant's request to the committee, the judge did not sequester the jury. The jury were selected on the basis that they would not be sequestered, although they were advised of a possibility of it. The judge noted in a memorandum of decision that one juror had a very young child at home, and that another juror of advanced age had shown some early signs of strain. Another factor in not sequestering the jury was that the trial was expected to last through the Christmas holiday season.

When the prosecutor brought the advertisement to the judge's attention, the judge engaged in an extensive discus-

sion of available alternatives. The prosecutor urged that the jury be sequestered. The judge noted the possibility of a mistrial. Defense counsel objected to a mistrial and suggested that the judge determine whether any juror had read the advertisement. The judge responded that, whether or not the jury had yet seen the advertisement, if they were not sequestered, it could come to their attention in the future. Defense counsel objected that the jury would be an angry jury if they were sequestered. Beyond suggesting a voir dire, defense counsel offered no alternative to sequestration or a mistrial. He argued both against sequestration and against a mistrial and, when the judge declared a mistrial, he recorded his objection. Only after the declaration of a mistrial did defense counsel allude to double jeopardy considerations.

In a memorandum of decision, filed several weeks after the declaration of a mistrial the judge noted that the advertisement "appeared to be a direct breach of the understanding and commitment which had led to . . . an unsequestered jury." If the defendant had carried out his agreement, his relatives and friends chose "to ignore his request or they were essentially uncontrollable in this regard — which did not bode well for the future conduct of the case."

The normally appropriate procedure when possibly prejudicial publicity comes to a judge's attention is to interrogate the jury. See *Commonwealth* v. *Jackson,* 376 Mass. 790, 799 (1978). The judge was aware of this requirement but concluded that it was not feasible to inquire of the jurors as to their knowledge of the advertisement. He said in his memorandum of decision that, if questioned concerning the advertisement, the jury would have attributed its publication to the defendant and "might well have considered [it] as a major impropriety on the defendant's part." He concluded that, unless the jury were sequestered, any such questioning would do more harm than good. The judge set forth in detail the reasons for his decision not to proceed with an unsequestered jury.[4]

---

[4] "Cautionary instructions, under the circumstances of this particular case, appeared to have a potential for more harm than good; they would

Having concluded that a fair trial required that the trial not continue with an unsequestered jury, the judge then weighed the question of the sequestration of the jury. "The problem with sequestering the jury was, first, that, as already stated, the particular jurors seated in this case had not been 'screened' with that possibility in view. The trial, by any account, would be protracted; a substantial number of witnesses were projected. More important, perhaps, was the impact upon the jury of a sequestration at this stage of the proceedings. No matter how skillfully the court approached the matter, there was little question but that the jury would have been angry, and that its anger would have been manifested against the party who (they would conclude) was the cause of their sequestration. Given the nature of the proceedings and the fact that certain questions to them in *voir dire* must have alerted them to the fact that there had been pre-trial publicity about the case and that the defendant (or his friends) had engaged in pre-trial activity on his behalf, it is highly likely that the jurors would have pointed the finger at the defendant as the cause of the change in their status, to his detriment. His attorney recognized this danger, that the jury would be 'angry.' On balance, the court was of the opinion that the risk of prejudice to the defendant by sequestering the jury was substantial, indeed."

have created jury curiosity and, with an unsequestered jury and the publicity that no doubt would have reached the media, would have created a situation rife with the seeds of prejudice. The case was being reported daily by the press, and it appeared to the court that, no matter what prophylactic measures were taken with the jury, to continue the case with an unsequestered jury meant the very real possibility that information of the publication would reach them through one form or another. Whether the prejudice would affect more the Commonwealth — whose motives for prosecution were sorely impugned by the offending advertisement — or the defendant — who would bear the onus of the publication of the ad — was uncertain. It might well have been that both the Commonwealth and the defendant would have suffered, one with certain jurors and the other with others. Thus the court discerned the development of a situation in which a fair trial for the defendant and for the Commonwealth would no longer be assured."

The judge expressed his conclusion, as follows: "Weighing all of the factors described, as well as others set forth in the colloquy with counsel, the court decided, on balance, that it should exercise its discretion in aborting the proceedings at the stage, in response to a situation which was created wholly by the defendant's family, relatives and friends and in no way by the Commonwealth or the court; and that here the public's interest in a fair trial designed to end in a just judgment, fair to both the Commonwealth and to the defendant, required such action. In short, there was a high degree of need under the singular and special circumstances which existed on November 30, 1979 — which had been created by the publication and broad dissemination of the offending advertisement by persons aligned with the defendant."

This case is unusual because the publicity was favorable to the defendant, was the product of efforts of members of his family and his friends, and was the aftermath of efforts the defendant made to expose his position through the news media. Further, the defendant was advised to take steps to prevent further publicity, and either he did not take adequate steps or his supporters chose to disregard any such requests. We do not say that the defendant voluntarily created the situation of which he complains and that therefore double jeopardy rights are not involved. Cf. *Lydon* v. *Commonwealth, ante* 356, 365 (1980). However, in assessing the defendant's constitutional claim, consideration may fairly be given to his contribution to the problem — his agreement to seek to keep others from publishing material in his favor in exchange for an unsequestered jury and his practice of generating favorable media publicity of which the troubling advertisement was an aftermath.

The issue is whether, jeopardy having attached, there was a manifest necessity for the declaration of a mistrial. *Arizona* v. *Washington,* 434 U.S. 497, 505 (1978). *United States* v. *Perez,* 22 U.S. (9 Wheat.) 579, 580 (1824). There is no mechanical formula by which to determine the

existence of manifest necessity. "[V]irtually all of the cases turn on the particular facts and thus escape meaningful categorization." *Illinois* v. *Somerville,* 410 U.S. 458, 464 (1973). See *United States* v. *Jorn,* 400 U.S. 470, 479-480 (1971).

If the judge had questioned the jury in general terms concerning whether any member had seen or heard of the publication, we might know of the extent of juror bias, if any, that already existed. We agree with the judge, however, that the problem existed for the future if the jury were not sequestered, even if, as we shall assume in the defendant's favor, questioning would have disclosed that no juror was then prejudiced by the advertisement.

The critical question, therefore, is whether the jury could have been sequestered at that time as a reasonable alternative to the declaration of a mistrial. We think it significant that the defendant did not point to sequestration as a reasonable option. Indeed, he opposed sequestration and made no proposal of any other alternative to the declaration of a mistrial.

The record would be considerably more satisfactory if the judge had inquired of the jurors whether sequestration at that time was reasonable and possible. Yet we accept as valid the judge's reasons for his refusal to sequester the jury. The necessity for a mistrial must be manifest; there must be a high degree of necessity; but it need not be absolute. *Arizona* v. *Washington,* 434 U.S. 497, 506 (1978). The jury had not been selected with sequestration in mind. Although the defendant now disclaims any concern over sequestration in terms of the adverse impact on him, at trial his counsel argued that, if sequestered, the jury would be angry. The judge was entitled to consider this factor in reaching his decision. Because the jury knew from the voir dire questioning that the defendant had engaged in pretrial publicity, the inference was reasonable that the jury would direct their anger at him. The judge was fully warranted in concluding that interrogation of the jury followed by sequestration would have created a substantial risk of preju-

dice to the defendant. The trial judge saw and heard the jurors and conducted the voir dire examination, including an inquiry concerning jurors' awareness of pretrial publicity. His evaluation of the likelihood that the impartiality of one or more jurors might be affected by sequestration is entitled to the "highest degree of respect." *Arizona* v. *Washington, supra* at 511.

We are satisfied that the judge exercised sound discretion in his decision to declare a mistrial. *Arizona* v. *Washington, supra* at 514. He did not act precipitately, or without awareness of the double jeopardy impact of an erroneous ruling. He gave each side a full opportunity to explain its position with respect to a mistrial, and explored less drastic alternatives, such as interrogation of the jurors, cautionary instructions, and sequestration. Contrast *United States* v. *Jorn,* 400 U.S. 470, 486-487 (1971); *Cherry* v. *Director, State Bd. of Corrections,* 613 F.2d 1262, 1267 (5th Cir. 1980); *United States* v. *Pierce,* 593 F.2d 415, 417-419 (1st Cir. 1979); *Jones* v. *Commonwealth,* 379 Mass. 607, 616-617 (1980). There was no abuse of discretion. The declaration of a mistrial was a matter of manifest necessity.

We answer the reported question in the affirmative. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*