**William G. REINSTEIN, Petitioner, Appellant,**

v.

**SUPERIOR COURT DEPARTMENT OF the TRIAL COURT OF MASSACHUSETTS, Respondent, Appellee.**

No. 81–1050.

United States Court of Appeals, First Circuit.

Argued April 9, 1981.

Decided Sept. 30, 1981.

**256**

Francis J. DiMento, Boston, Mass., with whom Richard B. Michaud and DiMento & Sullivan, Boston, Mass., were on brief, for petitioner, appellant.

Barbara A.H. Smith, Asst. Atty. Gen., Chief, Crim. Appellate Div., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for respondent, appellee.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

ALDRICH, Senior Circuit Judge.

By this petition for habeas corpus William G. Reinstein, a former mayor of Revere, seeks to overturn a decision of the Massachusetts Supreme Judicial Court that a mistrial, declared over his objection during his trial for conspiracy in the superior court, was justified by manifest necessity, preventing his reliance on the double jeopardy clause. *Commonwealth v. Reinstein,* —— Mass. ——, 409 N.E.2d 1307. The district court denied the writ. We affirm.

The trial had been his second. During the first a witness for the Commonwealth, one Sharigian, fell ill during cross-examination. A mistrial was declared, which defendant did not contest. Prior to his second trial defendant personally, and his family and friends self-styled as the Committee for Human Rights, engaged in issuing and publishing statements entirely inappropriate for a jury to read or learn of if the Commonwealth was to receive a fair trial. One such, a full page advertisement, appeared in several issues of TV FACTS, a weekly television guide distributed free throughout Revere, Winthrop, Chelsea and East Boston, purporting to disclose that Sharigian, described as a prosecution witness who had since died, had written a letter to the district attorney proclaiming defendant's innocence. Because of defendant's political position this alleged letter was the subject of considerable newspaper publicity.

Fearing continuation of such tactics, the Commonwealth requested at pretrial conference that the jury be sequestered. Defendant vigorously objected. The court denied sequestration in consideration of defendant's agreeing to maintain complete silence and "to request in the strongest of terms that the committee refrain, on the same basis as he will refrain, from any activity, [oral] or written in connection with this matter until it is concluded." Thereafter, on the second day of testimony, the district attorney brought to the court's attention that an issue of TV FACTS for the week about to commence, published two days ago, and a week after defendant's above undertaking, contained a full page ad repeating the supposed letter from the deceased witness and stating that the district attorney had ignored it, as a result of which to continue the prosecution would be a political vendetta and harassment, and a miscarriage of justice. "If those in power are trampling on Reinstein's rights today, tomorrow they can trample on yours." The statement was "Sponsored by the Commit-

tee for Human Rights." Approximately 5,000 copies of the guide had been published and left in various business establishments for distribution. Three of the sixteen jurors came from the immediate circulation area.

The court, not unnaturally, was deeply upset. The defendant requested a voir dire of the jury, but the court declined. It stated,

"I've got only two remedies as far as I can see. One is to lock up this jury at this point. The other one is to declare a mistrial. My inclination is not to lock up this jury, even though I said it was a possibility, because, as I see it, having listened to this matter, we may well go through the Christmas season with this case, and that it would not be fair to the sixteen persons presently here, on the conditions that were given, to do that at this time."

It was expected that trial would last several weeks, and for at least two jurors it was known that sequestration would present problems.

Defendant's then response was to continue his opposition to sequestration.[1] Counsel said, "If you sequester the jury, the jury is just going to be an angry jury." In his next breath, the court having pointed out why, inevitably, it would be the defendant who would be the one blamed, counsel added, "This is a disaster, Your Honor."

Disaster it was. It seems clear that as between mistrial and sequestration the former was the better choice, or, at a minimum, within "the sound discretion of a presiding judge." *Wade v. Hunter*, 1949, 336 U.S. 684, 692, 69 S.Ct. 834, 838, 93 L.Ed. 974. The sole question is whether there was some other, less drastic, choice which, upon reflection, should have been obvious to

the court,[2] or whether, within the trial court's "sound discretion," a "manifest," viz., a "high degree," of necessity dictated a mistrial. *Arizona v. Washington*, 1978, 434 U.S. 497, 505–06, 98 S.Ct. 824, 830–31, 54 L.Ed.2d 717.

Concededly, as the Massachusetts Supreme Judicial Court recognized, the normal first response in a situation of this kind is to conduct a voir dire of the jury, individually or collectively. *See, e. g., United States v. Perrotta*, 1 Cir., 1977, 553 F.2d 247, 249–50; *Commonwealth v. Reinstein*, ante, 409 N.E.2d at 1310. Various special objections to a voir dire in this case have been advanced, but nothing prevented having a voir dire and then deciding whether to declare a mistrial. Accordingly, omitting a voir dire can be excused only on the assumption that sequestration or mistrial, in this case mistrial, was necessary regardless of whatever should be learned. Hence we make the assumption the most unfavorable to the Commonwealth, that a voir dire would have disclosed that no juror had learned of the TV publication.

In this event the first question would be the likelihood of some juror or jurors learning of the publication thereafter. Defendant urged upon the court that a group was at work retrieving issues of TV FACTS and cutting out the offending page. The Commonwealth's answer, which could not be rebutted, was that it could not be told how many remaining copies—such as the district attorney's—had already been distributed. These copies would be current for an entire week. Hanging over this was the fact that this trial was not simply a local issue; if the metropolitan-wide press, which had been much interested before, should get wind of it, the jig would be up. Under the circumstances, we believe the court could reason-

---

1. In his brief defendant now makes much of the fact that the court had initially recognized the possibility of sequestration. Defendant fails to mention that in the same breath it recognized the possibility of a mistrial.

2. It was suggested by a member of this court during argument that all objections might have been met, or largely met, by automatically excusing the three members from the infected

area and conducting a voir dire as to the balance. If this should be thought correct, *but see* text, post, regarding the court's apprehensions for the future, it seems harsh to fault the court for not thinking of something that even in his brief before this court defendant had not yet thought of. *Arizona v. Washington*, post, does not set so high a standard for the trial court.

ably fear there was a substantial danger that the jury, even if presently ignorant, would not remain so.

Next, the question comes, why, in place of a mistrial, would not the customary warning to the jury to disregard matters learned outside of court be sufficient? Whether jurors can, or will, comply is a subjective matter that must be decided case to case. *Compare United States v. Pierce*, 1 Cir., 1979, 593 F.2d 415, *with Killilea v. United States*, 1 Cir., 1961, 287 F.2d 212, *cert. denied*, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259. Like the trial court we regard this particular publication as peculiarly prejudicial. In the first place, the writer of the putative letter was dead, and could not be called—his alleged out-of-court disclosure would not be before the jury to be rebutted. This was a case where the information coming to the jury out of court would be more prejudicial than if introduced on the stand. Second, the information was not only given in highly inflammatory terms, but it had the apparent endorsement of some broad, public spirited body, a Committee for Human Rights, which had a general concern about the future. If it had been truthfully signed, viz., The Family and Friends of Reinstein, whose interest is personal and partial, it would have been far less harmful. As it was it was admirably designed to outrage a lay juror, and make an impression difficult to eradicate.[3]

How much jurors are influenced by out-of-court information, and whether the effect can be eradicated, is a subject on which there can be much disagreement. Certainly there are cases where eradication can reasonably be thought highly doubtful. *E. g., Simmons v. United States*, 1891, 142 U.S. 148, 154–55, 12 S.Ct. 171, 172, 35 L.Ed. 968; *Delaney v. United States*, 1 Cir., 1952, 199 F.2d 107, 112–13. As the Court said in *Arizona v. Washington*, ante, 434 U.S. at 511, 98 S.Ct. at 833,

"[T]he extent of the possible bias cannot be measured, and . . . some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions. In a strict, literal sense, the mistrial was not 'necessary.' Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected . . . ."

The court here obviously thought about the matter. After discussing the facts it said,

"It seems to me that the potential, the possible mischief because of an ad of this nature widely disseminated . . . is so widespread that I just wonder whether there is any effective remedy in this matter except to declare a mistrial."

The court then dwelt upon the circumstances of the publication, post. When in addition to this careful consideration there has been a full review by the state appellate court—a court well aware of manifest necessity requirements, see *Jones v. Commonwealth*, 379 Mass. 607, 400 N.E.2d 242; *Costarelli v. Commonwealth*, 1978, 374 Mass. 677, 373 N.E.2d 1183—we should be particularly slow, both as to the factual likelihood of the jurors learning of the publication, and of its corrosive nature, to disagree with the state court's conclusions. *See Sumner v. Mata*, (1981) 449 U.S. 764, 101 S.Ct. 764, 66 L.Ed.2d 722.

If, nevertheless, this be thought a close case, we agree with the trial court's attaching weight to the special circumstances. While defendant asserted, and the court accepted, that he was not responsible for this particular release, it was defendant who had started the campaign of prejudicial material now carried on by his supporters. Moreover, although the publisher stated that publication this time was an accident,[4]

---

3. One wonders what the court could tell the jurors. "If you should, in spite of my precautions, see a publication sponsored by the Committee for Human Rights, this is not some pub-

lic committee, but a group of defendant's personal family and friends"? Obviously not.

4. Defendant points out that the Commonwealth offered no contradiction to this affidavit. Pass-

it appeared that, in spite of the strong assurance given on defendant's behalf at the pretrial conference, he had not thereafter repeated the alleged earlier request to the publisher not to print further advertisements relating to his trial. More than a week ensued between defendant's undertaking and the new release, during which time defendant did nothing to impress upon the TV publisher the importance of silence. Even if this was merely inadvertence, the court could still feel that an undertaking to caution his supporters "in the strongest terms" had not been adhered to.

We cannot agree with our dissenting brother that the court should have to accept defendant's representation that he was blameless. In acknowledging that an inference could be drawn either way, ("This ["that Reinstein reasonably believed that the publisher's assent to his initial request obviated any further action"] is not an irrefutable conclusion, but it is as plausible as the negative conclusion accepted by the court") the dissent fails to follow its own, earlier, concession that we must accept the court's "sound discretion" "[e]ven though, viewing the same facts *de novo*, we might have chosen a course different . . . ." This basic rule is not to be avoided by calling two inferences equal and then invoking the principle that the burden was on the Commonwealth. Deference is inappropriate and the burden of proof is determinative only when it is impossible to weigh one inference more heavily than the other. *See Merrill Trust Co. v. Bradford*, 1 Cir., 1974, 507 F.2d 467, 471. The court had a right to distinguish, in a matter as important as this, between good faith expectations and the extra precautions it felt reasonably called for by the terms of this agreement.

Finally, not only was the ad the admitted product of defendant's family and friends, but defendant did not contradict the district attorney's statement that he had heard that defendant's mother was a part owner of the guide itself. The court could not be faulted

ing the question of the difficulty of entering defendant's camp, we do not find the affidavit

for not liking any part of this picture, which could well lead, given the established behavior of defendant's supporters, to fear of a further "accident," perhaps one that might escape the court's attention. In a subsequent explanatory memorandum the court stated it felt this occurrence "did not bode well for the future conduct of the case." We have no doubt that this was its feeling at the time. Nor can we think it an unreasonable one.

Spontaneous publicity from the media may injure one party or the other, and one must normally live with it. But when a defendant has gathered supporters who indulge in highly improper tactics, at least to some extent he must be the one to take the consequences. We would not want to send out a message that, so long as defendants keep their own hands clean, their supporters can put prejudicial matters before the jury and force the prosecution to rely on the hoped-for efficacy of balancing instructions. *Cf. Arizona v. Washington*, ante, 434 U.S. at 513, 98 S.Ct. at 834. The court had accepted defendant's request not to sequester the jury once. We will not rule it improperly concluded that once was enough. The order denying the writ is affirmed.

BOWNES, Circuit Judge (dissenting).

Unable to conclude that under the circumstances of this case, there was a "manifest necessity" for a mistrial, I dissent.

The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." As interpreted by the Supreme Court, the guiding principle of this deceptively simple command "is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thus subjecting him to embarrassment, expenses and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he

the most convincing we have ever read.

may be found guilty." *Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). When a jury or court has acquitted a defendant of the offense charged, this principle governs without question. *Arizona v. Washington*, 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978). But when a defendant seeks to foreclose reprosecution following a first trial that ended, despite his objection, prior to final verdict, the state is not absolutely barred from another attempt at securing a conviction. Factors present in the first trial may warrant subordinating a defendant's "valued right to have the trial concluded by a particular tribunal . . . to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Id.* at 505, 98 S.Ct. at 830; *Wade v. Hunter*, 336 U.S. 684, 688–89, 69 S.Ct. 834, 837, 93 L.Ed.2d 974 (1949). Since 1824 the Supreme Court has categorized the various limited situations that permit such subordination under the opaque rubric, "manifest necessity." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *see Illinois v. Somerville*, 410 U.S. 458, 461–66, 93 S.Ct. 1066, 1069–71, 35 L.Ed.2d 425 (1973). Though recognizing that a defendant presumably suffers regardless of the reasons for aborting the first trial, *see United States v. Jorn*, 400 U.S. 470, 483, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971) (plurality opinion), the Court has held that the prosecution may avail itself of a second opportunity if it can "shoulder the burden" of showing that a manifest or "high degree" of necessity justified the earlier mistrial. *Arizona v. Washington*, 434 U.S. at 505–506, 98 S.Ct. at 830–831.

In reviewing the trial court's decision to declare a mistrial, over a defendant's objection because the impartiality of one or more jurors may have been impaired, we are bound to accord substantial deference to that decision. *See Arizona*, 434 U.S. at 507–15 & n.33, 98 S.Ct. at 831–35 & n.33. To ascertain whether the conditions of a particular trial have created a manifest necessity for a mistrial depends not on the facile application of an established formula but on the careful weighing of the various conditions specific to that proceeding, a task for which the trial court is typically best situated. *Id.* at 513–14, 98 S.Ct. at 834. Thus, our role is confined to ensuring that the trial court's decision reflects a "sound discretion," *id.* at 514, 98 S.Ct. at 835, *quoting United States v. Perez*, 22 U.S. (9 Wheat.) at 579, 6 L.Ed. 165, sensitive to the defendant's interest in "being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States v. Jorn*, 400 U.S. at 486, 91 S.Ct. at 558. Even though, viewing the same facts *de novo*, we might have chosen a course different from that elected by the trial court, so long as the court has adequately considered the available alternatives to a mistrial we must accept its conclusion that the mistrial was manifestly necessary. *See Harris v. Young*, 607 F.2d 1081, 1085 & n.4 (4th Cir. 1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *United States v. Pierce*, 593 F.2d 415, 417–19 (1st Cir. 1979); *United States v. Sanders*, 591 F.2d 1293, 1298–99 (9th Cir. 1979); *United States v. McKoy*, 591 F.2d 218, 222 (3d Cir. 1979); *United States v. Starling*, 571 F.2d 934, 941 & n.10 (5th Cir. 1978).

I do not join the majority because in my opinion the trial court failed to sufficiently assess the alternatives available under the facts of this case.

The trial court's decision to declare a mistrial hinged on its belief that the jury would probably have learned of the advertisement and that this knowledge would likely have undermined the impartiality of at least some of the jurors. Whether or not knowledge of the advertisement would have biased the jury's judgment, I am troubled by the court's underlying supposition that at some time during the trial the jurors would have gained that knowledge. The advertisement was published in a periodical distributed for the television audience of a limited area in which only three of the sixteen jurors resided. Given these facts, at most the trial court might reasonably have assumed that those three jurors had

learned of the potentially prejudicial advertisement. Even if the court had so assumed, however, it could have removed the three jurors and proceeded with a jury of thirteen.[1] To have also presumed that the advertisement eventually would have come to the attention of the other thirteen jurors was, on the basis of this record, extremely fragile support for the decision to abort the trial.

Ordinarily, when a trial court is made aware of potentially prejudicial publicity, it should first poll the jury to ascertain whether the jurors have also learned of that publicity. *See United States v. Perrotta*, 553 F.2d 247, 249 (1st Cir. 1977); *Commonwealth v. Jackson*, 376 Mass. 790, 383 N.E.2d 835, 841–42 (1978). If they have not, then the appropriate course is to caution the jury to shun any publicity about the trial and to remind it of its obligation to judge the defendant solely on the evidence introduced at trial. The trial court in this case, however, assumed, without explanation, that a voir dire and cautionary instructions would have exacerbated the perceived problem, increasing the probability that the jurors would have learned of the advertisement at some point during the trial. I think the trial court seriously underestimated its ability to frame, with the help of the parties, satisfactorily neutral questions for a voir dire and appropriate cautionary instructions. Trial courts are regularly required to compose such questions and instructions in such a fashion as to not adversely affect the jury's judgment. I see no reason why the court could not have done so in this case.[2]

The majority suggests that "if the metropolitan-wide press, which had been much interested before, should get wind of [the ad], the jig would be up." But nothing in the record or in the majority's opinion reveals any circumstances to warrant that assumption. The jig would no more have been up in this case than it would in the numerous other criminal trials that are subject to media attention and publicity. To *presume* that the jury has been exposed to prejudicial publicity requires conditions such as those that surrounded the trial at issue in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). But the circumstances of this case were a far cry, even potentially, from the incredible media blitz that enveloped the *Sheppard* trial. In the absence of such extraordinary conditions, I think we must assume that the jury would have complied with instructions from the trial court to shun all publicity. Only if the trial court had justifiably lost "confidence in the jury's integrity and responsibility," *United States v. Pierce*, 593 F.2d at 419, might it be acceptable to dismiss cautionary instructions as a fruitless alternative. The trial court did not, however, express a loss of confidence and even if it had, there is nothing in the record to support such a finding. *See id.* Whether or not the jury could have remained impartial knowing of the contents of the advertisement should concern us only if there was good reason to presume that they would have acquired that knowledge. And in my view that reason did not exist.

In certain circumstances a trial court properly may assume that information known to the jury will so bias its judgment that a mistrial must be ordered. *See, e. g., Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717; *Grooms v. Wainwright*, 610 F.2d 344, 346 (5th Cir.), *cert.*

---

1. Unlike the majority, I do not consider this possibility so subtle that the court should not be expected to have entertained it, regardless of the parties' silence.

2. In *United States v. Perrotta*, 553 F.2d 247 (1st Cir. 1977), and *Commonwealth v. Jackson*, 376 Mass. 790, 383 N.E.2d 835 (1978), this court and the Supreme Judicial Court, in the exercise of their respective supervisory powers, established guidelines for trial courts confronted with the problem of potentially prejudicial pub-

licity. As the Commonwealth correctly observes, those guidelines were cast in light of the constitutional guarantee of an impartial jury, without reference to the Double Jeopardy Clause. Nevertheless, in the absence of special conditions militating against compliance with those guidelines, of which there were none in this case, I consider the guidelines to define "sound discretion," *Arizona v. Washington*, 434 U.S. 497, 514, 98 S.Ct. 824, 835, 54 L.Ed.2d 717 (1978), in this context.

*denied,* 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980). But the propriety of such an order rests on the court's knowledge that the jury has in fact been exposed to the potentially prejudicial information. Without such knowledge, a trial court reasonably cannot, on the basis of the mere possibility of jury exposure to potentially prejudicial material, override a defendant's right to the completion of a trial to which jeopardy has attached, particularly where, as here, the defendant has strongly opposed a mistrial and actively sought a voir dire.

Only one factor might distinguish this case from the numerous trials that are subject to publicity: the potentially prejudicial advertisement was the work of a blatantly partisan group whose publicity efforts, the trial court believed, had ended when the court obtained Reinstein's commitment. Having proceeded to trial with an unsequestered jury in the expectation that no further publicity would flow from the defendant's camp, the trial court expressed a sense of betrayal when the advertisement appeared. Although the court expressly did not hold Reinstein personally responsible, it did state that the commitment had been breached. But what little evidence there is suggests that Reinstein did what he had

promised: He refrained from public comment and attempted to prevent others from disseminating publicity on his behalf.[3]

The majority asserts that Reinstein's failure to renew his request to the publisher of TV FACTS to stop publication of the advertisement evidences a less than adequate effort to fulfill his commitment. But it can just as fairly be inferred that Reinstein reasonably believed that the publisher's assent to his initial request obviated any further action. And it can also reasonably be inferred that Reinstein felt confident about the publisher's compliance with his request precisely because Reinstein's mother was part owner of *TV* FACTS. For all we know from the record, his mother, in deference to her son's commitment, opposed the Committee's campaign.

Other than the rebuttable inferences adopted by the majority, there is no evidence to justify saddling Reinstein with the assumed consequences of the Committee's action. The Commonwealth has failed to produce *any* evidence in support of the "findings" it now claims justified the declaration of a mistrial. Most importantly, it never attempted to rebut the publisher's affidavit, which, because unrebutted, I think this Court is bound to accept.[4] With-

---

**3.** The trial court's comments, at trial and in its subsequent memorandum, suggest to me that the court believed that with the commitment it had secured the silence of the defendant's camp. Thus, the breach of that silence was, from the court's perspective, a breach of the commitment. But Reinstein's commitment was to try in whatever way possible to restrain the others. He did not promise to be absolutely effective: there was no guarantee. Moreover, it is far from clear that the trial court found that Reinstein had breached the commitment. Although the court darkly suggested in the memorandum that Reinstein was "vitally affected" by the publication, it implicitly left the question open, stating, "If the defendant had in fact complied with his undertaking, either his family, relatives and friends had chosen to ignore his request or they were essentially uncontrollable." This is not a finding that Reinstein had breached the commitment. Unable to decisively conclude that Reinstein had broken his promise, the trial court essentially penalized Reinstein for his past association with the Committee, an avenue which I think was foreclosed by the *court's* decision to pro-

ceed with an unsequestered jury. *See* p. 259 *infra.*

**4.** Because I differ with the majority's vaguely deprecatory evaluation of the publisher's affidavit, I think it useful to set out the pertinent parts of that document:

3. On several occasions in the months of October and November, 1979, an advertisement concerning the prosecution of William Reinstein was published in TV Facts on behalf of the Committee for Human Rights.

4. Several days before November 21, 1979, William Reinstein asked me not to publish any further advertisements regarding his trial.

5. On November 21, 1979, the TV Facts for the week of December 2, 1979, was submitted to the printer in Framingham, Massachusetts. At that time, an advertisement concerning the prosecution of William Reinstein was inadvertently placed in the material to be printed contrary to the request of William Reinstein.

6. The mistake made in publishing the advertisement was due to a combination of factors at the publisher's office. Normally, the

out evidence sufficient to conclude that Reinstein breached his commitment, the pro-Reinstein character of the ad and its source should play no role in determining whether the mistrial was manifestly necessary.

The trial proceeded with an unsequestered jury on the basis of Reinstein's commitment, not on an agreement that even if Reinstein did what he could to silence his supporters, publication of another advertisement would free the trial court to declare a mistrial, regardless of Reinstein's objection. So long as Reinstein was blameless, which I think must be accepted on this record, the trial court remained obligated to adequately explore all the alternatives to a mistrial. Perhaps the court erred in agreeing to go forward with the jury unsequestered. But if this was an error, which I doubt, it was the court's, not Reinstein's error. And it is the Commonwealth, not Reinstein, which under the Double Jeopardy Clause must accept the consequences of the court's error.

Given Reinstein's earlier participation in the Committee's publicity campaign, the majority's suspicions about the adequacy of Reinstein's efforts to stop the publicity are understandable. Unsubstantiated suspicions are not, however, the equivalent of a manifest necessity. The Commonwealth had the opportunity to substantiate those suspicions and it has come forth with nothing. From Reinstein, however, we have not only the publisher's affidavit but also Reinstein's representation that he fulfilled his commitment. And this should not be lightly disregarded. Reinstein has been under indictment since 1976, has had to prepare twice for trial and has already started two trials. This is a formidable burden which I think lends credence to his assertion that he sincerely attempted to fulfill his commitment so that at last he could obtain a final verdict. This is not an irrefutable conclusion, but it is as plausible as the negative conclusion accepted by the majority.

From the sparse record available in this case the majority consistently relies upon those inferences least favorable to Reinstein, disregarding the equally plausible inferences favorable to him. In doing so, I think the court fails to place the burden where it belongs. It is the Commonwealth that must "shoulder the burden" of justifying a mistrial declared over the defendant's objection. *Arizona v. Washington*, 434 U.S. at 505–06, 98 S.Ct. at 830–31. In requiring the prosecution to prove that a high degree or manifest necessity warranted the mistrial, the Supreme Court has struck what it considers the appropriate balance between the public interest in criminal enforcement and the defendant's "valued right" to see the trial through to a final verdict. With one exception,[5] however, the majority here chooses to rely on those inferences and assumptions most favorable to the Commonwealth. The apparent reason for this choice is the court's perceived obligation to "be particularly slow" in disagreeing with the state court's findings of fact. But a federal court is obligated to defer only to those findings of a state court which are "fairly supported" by the record. 28 U.S.C.

publisher has a two-day deadline, Wednesday and Thursday of each week, to assemble the material to be published and to send it to the printer. During the week that the mistake was made, the Thanksgiving holiday reduced the deadline time period to one day, the Wednesday before Thanksgiving. In addition, the publisher had recently changed from using an out-of-state printer to using a local printer in Framingham and certain confusion developed in the office as a result of this change. This confusion and the one-day deadline lead to our mistake in placing the advertisement in the material sent to the printer.

7. On November 28, TV Facts containing the advertisement was distributed to the communities of Revere, Chelsea, Winthrop, East Boston, Lynn, Nahant and Saugus.

8. On November 29, I informed William Reinstein of the advertisement published by mistake.

9. Upon Mr. Reinstein's request, I went to the various distribution outlets and retrieved approximately 600 copies of TV Facts for the week of December 2, 1979.

Signed this 25th day of January, 1980, under the pains and penalties of perjury.

/s/Donald J. Rolinson

5. The majority properly assumes that a voir dire "would have disclosed that no juror had learned of the TV publication."

§ 2254(d)(8); *see Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). To defer to findings for which there is not fair support, as I conclude in the case here, effectively shifts the burden from the prosecution to the defendant. The ultimate, and unjustifiable, result of this shift is to depreciate the defendant's constitutionally protected right and to retreat beyond the proper boundaries of our habeas corpus jurisdiction. Because I cannot concur in such a result, mindful that ground once lost is regained only with great difficulty, I respectfully dissent.