COMMONWEALTH vs. ANTHONY J. JACKSON.

Middlesex. September 13, 1978. — December 12, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Practice, Criminal,* Continuance, Assistance of counsel, Judicial discretion, Newspaper article, Fair trial. *Waiver.*

A judge at a criminal trial did not abuse his discretion in denying the defendant's motion for a continuance where the trial had been delayed for three years at the defendant's request, where the defendant made no showing of a particular need for a continuance, and where he was not prejudiced in his defense by the denial. [792-794]

The record in a criminal case amply supported a finding that the defendant knowingly and intelligently waived his right to counsel. [794-795]

A judge at a criminal trial did not abuse his discretion in refusing a defendant's request on the first day of trial to abandon his self-representation and use his court-appointed legal advisor as defense counsel where the defendant had already caused a lengthy delay in the trial and where there was no showing of good cause for the untimeliness of the request. [795-797]

A judge's refusal at a criminal trial to question empanelled jurors individually concerning the impact on them of a newspaper article dealing with other charges pending against the defendant did not constitute an abuse of discretion nor deprive the defendant of a fair trial. [797-799]

Discussion of procedures to be followed when a claim of potentially extraneous influence on a jury is brought to a judge's attention after the jury are selected. [800-801]

INDICTMENTS found and returned in the Superior Court, two on January 10, 1973, and one on January 14, 1973.

The cases were tried before *Dimond,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Thomas Hoffman* for the defendant.

*James W. Sahakian,* Assistant District Attorney (*William L. Pardee,* Assistant District Attorney, with him) for the Commonwealth.

WILKINS, J. The defendant appeals from his conviction of armed assault with intent to murder and unlawful carrying of a firearm.[1] He argues that he was unfairly forced to go to trial, representing himself, in circumstances where a continuance should have been granted and counsel appointed. We conclude that there was no abuse of discretion in proceeding to trial on the day designated, with the defendant acting for himself.[2] We reject, as not properly before us, the defendant's unrelated contention that, because of certain newspaper publicity during trial, the judge should have conducted an individual voir dire of each empanelled juror. We do, however, set forth the appropriate procedures which should be followed in similar circumstances in the future.

We briefly describe the evidence because we shall have occasion to consider whether certain of the judge's rulings prejudiced the defense or gave rise to a substantial risk of a miscarriage of justice.

The evidence of the defendant's guilt was overwhelming. On December 26, 1972, one of two Cambridge police officers in an unmarked van observed the defendant driving a Cadillac automobile and apparently accosting a female pedestrian. The police officers in the van followed the Cadillac automobile, which sped away. They lost sight of it, spotted it again, and gave chase. Another police vehicle joined the pursuit. The Cadillac automobile was

---

[1] The defendant was convicted also of assault by means of a dangerous weapon and of three motor vehicle offenses. These cases were placed on file, the defendant not objecting.

[2] We have allowed the Commonwealth's motion to expand the record to include the transcript of a pretrial hearing in this matter (referred to in the briefs of each party) and certain transcripts or records in other criminal proceedings involving the defendant. These documents bear on the merits of certain issues in this case.

found abandoned a few minutes later. Nearby and shortly
thereafter, two other police officers in a cruiser saw a
pedestrian whom they identified as the defendant. When
they approached the defendant, he drew a gun and fired
at them. The police officers returned the fire. The defend-
ant appeared to have been hit, but he fled on foot. A few
minutes later the defendant was found approximately
three blocks away, lying in the street wounded. He was
wearing an empty holster. He told the officer who first
approached him, "I don't have the gun." At the hospital,
a spent bullet was found in the defendant's clothing. The
bullet was of the same caliber as the guns of the officers
who had been involved in the shoot-out. Keys to the Cadil-
lac automobile were found, along with material identify-
ing the defendent, in an alley between the location of the
shooting and the location of the defendant's arrest. A gun
was found in that alley eight days later. There was evi-
dence that a bullet recovered from the scene of the shoot-
ing had been fired from that gun.

The defendant presented no substantial evidence in his
defense. He suggested that the police had failed to investi-
gate the possibility of other suspects, including the regis-
tered owner of the Cadillac automobile.

1. There was no abuse of discretion in denying the de-
fendant's requests for a continuance. At a hearing on
June 3, 1976, trial was set for June 14, 1976. The defend-
ant requested a continuance in order to prepare for trial,
and the judge denied the request. Such a determination
will be disturbed only if there was a clear abuse of discre-
tion. *Commonwealth* v. *Watkins*, 375 Mass. 472, 490
(1978), and cases cited. See *Ungar* v. *Sarafite*, 376 U.S.
575, 589 (1964). The defendant has made no such showing.

The indictments in this case were handed down in
January, 1973. In June, 1973, at the defendant's request,
an order was entered deferring trial in this case, and
certain other cases involving the defendant, until the
conclusion of the trial against the defendant in the so
called Reich murder case. The trial of the Reich case was

substantially delayed. This delay, as we noted in *Jackson* v. *Commonwealth*, 370 Mass. 855 (1976), was due to the defendant's failure to establish and maintain a satisfactory working relationship with any of the various attorneys who had been retained by, assigned to, or offered to the defendant. Shortly after our 1976 opinion, the order giving priority to the Reich trial was rescinded. The judge who denied the continuance in this case was aware of the defendant's record of delay in the Reich case and that those delays had also prevented the case at bar from proceeding to trial.

The defendant had no reasonable basis for being unprepared for trial by reliance on the order deferring the trial of this case. The order had deferred only the trial date and had placed no restrictions on preparation for trial. Nor did the withdrawal of counsel, approved by the judge on June 3, 1976, require a continuance. The defendant had long known that those withdrawals were inevitable, and they were solely the product of his own conduct. *Jackson* v. *Commonwealth*, 370 Mass. 855 (1976). See *Commonwealth* v. *Bettencourt*, 361 Mass. 515, 517-518 (1972); *United States* v. *Rodriguez Vallejo*, 496 F.2d 960, 964-965 (1st Cir.), cert. denied, 419 U.S. 965 (1974). The defendant was offered new counsel at the hearing, and the trial was still eleven days away.

There are further grounds for upholding the denial of a continuance. The record indicates, in addition, that the defense had substantially prepared for trial in the six months following the indictments. In August, 1973, the Commonwealth had presented a general version of the events surrounding this case in a hearing on a motion to suppress filed in another of the criminal proceedings against the defendant. The defendant made no showing on June 3, 1976, of a particular need for a continuance. Even now, the defendant has not demonstrated how the denial of the continuance prejudiced him at trial. The judge accommodated late requests for an investigator, a ballistician, and a psychiatrist. The defendant presented

his defense vigorously. He used transcripts of prior pro-
ceedings for the purpose of impeachment, called his own
witnesses, and successfully excluded a confession which
he had given at the hospital following the shooting.

If we assume that the denial of a continuance on the
first day of trial is before us on the assignments of error,
there was no abuse of discretion for reasons already giv-
en. The defendant has made no showing that his receipt
of certain papers four days before trial was prejudicial to
him.

2. On June 3, 1976, after the trial date of June 14, 1976,
was established, the judge accepted the defendant's re-
quest that he be permitted to represent himself at trial.
The defendant claims that the judge improperly conclud-
ed that the defendant had waived his constitutional right
to counsel. The colloquy between the judge and the de-
fendant, portions of which are set forth in the margin,[3]
plainly warrants the judge's conclusion that the defend-
ant knowingly and intelligently waived his right to coun-
sel. Indeed, he insisted on his constitutional right to
represent himself, apparently citing (although by the
wrong name) and quoting from the opinion of the Su-

---

[3] On June 3, 1976, the defendant indicated that, if counsel were
allowed to withdraw, he would represent himself. Later, the judge
suggested that he was "going to appoint counsel, a legal advisor, for
you, anyway." The following conversation then occurred:

THE DEFENDANT: "Your Honor, Barry versus California says I have
a right to try without legal counsel, without any assistance, without
any attorney sitting at the table with me; and that is a U.S. Supreme
Court, recent case, 1975."

THE JUDGE: "You are a highly intelligent person, Mr. Jackson, but
you are not trained in the—"

THE DEFENDANT: "I understand."

THE JUDGE: "You are not trained as a lawyer."

THE DEFENDANT: "I understand that, Your Honor. It says that—the
last statement of the decision says that: we bestow on the defendant
the right to defend himself—although one who defends himself may
have a fool for a client. And I ask the Court for that right. If I must
sail the sea, I want to be at the helm of my own ship, Your Honor,
without counsel."

THE JUDGE: "I will take those matters under advisement."

preme Court in *Faretta* v. *California*, 422 U.S. 806 (1975). On June 4, 1976, the judge filed a statement in which he noted that the defendant stated in open court that he wished to proceed "pro se," and added that "if the defendant does not desire to make use of appointed counsel, I appoint said counsel as legal advisor in all proceedings."

The defendant was adequately aware of the seriousness of the charges, the magnitude of his undertaking, the availability of advisory counsel, and the disadvantages of self-representation. See *Faretta* v. *California*, 422 U.S. 806, 835 (1975). The record shows that the defendant was "literate, competent, and understanding." *Id.* The finding of the defendant's waiver of right to counsel was fully justified. See *Fillippini* v. *Ristaino*, 585 F.2d 1163, 1165-1167 (1st Cir. 1978).

The assertion in the defendant's brief that his waiver of counsel was contingent on the granting of a continuance is incorrect. The trial date was firmly established before the court considered the question of representation, and at no time did the defendant suggest that his waiver of counsel was contingent on a change of the trial date.

3. The defendant makes a fleeting reference to the judge's refusal to let him abandon his self-representation and use his court-appointed legal advisor as defense counsel. He made such a request on the first day of trial, and repeated it several times during the course of the trial. Although this issue is presented to us in the context of the defendant's claim that he never effectively waived his right to counsel, we shall treat the defendant's assertion as a claim of an abuse of discretion in the judge's refusal to permit him to retract his decision to represent himself.

On June 14, 1976, before the jury were selected, the defendant asserted that he had not had adequate time to prepare the case and asked the judge to permit his court-appointed legal advisor to defend him. Seemingly gone was the eloquent self-confidence of June third—"And I ask the Court for that right [to defend myself]. If I must

sail the sea, I want to be at the helm of my own ship, Your Honor, without counsel."

The judge did not abuse his discretion in turning down the defendant's request made at that late date. While we recognize the importance of counsel, we reject any suggestion that every defendant has an absolute right at the moment trial is to begin to retract his decision to represent himself. See *Glenn* v. *United States*, 303 F.2d 536, 540-541 (5th Cir. 1962), cert. denied sub nom. *Belvin* v. *United States*, 372 U.S. 922 (1963). A court faced with a dilatory defendant has the power to take reasonable measures to keep proceedings moving forward, even if a defendant's refusal to arrange representation leaves him without counsel. See *Ungar* v. *Sarafite*, 376 U.S. 575, 588-591 (1964); *Kates* v. *Nelson*, 435 F.2d 1085, 1088-1089 (9th Cir. 1970); *Nunn* v. *Wilson*, 371 F.2d 113, 117-118 (9th Cir. 1967); *Glenn* v. *United States, supra.* These proceedings had been long delayed by the failure of the defendant to make satisfactory arrangements for representation in other criminal matters pending against him, and the judge had seasonably put him to a clear choice between counsel and self-representation.

Furthermore, the defendant delayed his request for counsel until the final moment before trial, without showing good cause for not having made a more seasonable request. The defendant's last-minute assertion of lack of preparation did not have to be accepted at face value. There was ample justification for the judge to conclude that the request was just another dilatory tactic. See *Commonwealth* v. *Scott*, 360 Mass. 695, 699 (1971); *United States* v. *Rodriguez Vallejo*, 496 F.2d 960, 965 (1st Cir.), cert. denied, 419 U.S. 965 (1974). Even if we assume that the defendant had the right to retract his decision to represent himself and to seek the appointment of counsel, the delay of the request until immediately prior to trial brought it within the broad discretionary power of a court over requests for last-minute shifts in representation which threaten to delay a proceeding. See *Common-*

*wealth* v. *Bettencourt,* 361 Mass. 515, 517-518 (1972); *Commonwealth* v. *Scott, supra* at 698-701; *Commonwealth* v. *Flowers,* 5 Mass. App. Ct. 557, 565-566 (1977).

The decision of the judge was consistent with a concern for a fair trial. The defendant had substantially prepared his case with the assistance of counsel. He was familiar with the Commonwealth's case against him. He had accepted a legal advisor.

In addition, the defendant has failed to prove an abuse of discretion in the denial of his requests to change counsel during trial. In this latter situation, a defendant's freedom to change counsel is significantly more restricted than it is before trial has commenced. *Commonwealth* v. *Miskel,* 364 Mass. 783, 791 (1974), and cases cited.

4. The defendant argues finally that he was denied a fair trial because the judge declined to question the empanelled jurors separately concerning the impact on them of a newspaper article which most of them read on the morning of the second day of trial. Although the defendant excepted to the judge's determination to question the jurors collectively concerning this article, rather than individually, he has not assigned the judge's ruling as error. In such a case, the propriety of the judge's failure to interrogate each juror individually is not before us for consideration. See *Commonwealth* v. *Wallace,* 356 Mass. 92, 97 (1969); *Commonwealth* v. *Chester,* 337 Mass. 702, 703 (1958). In the absence of a proper preservation of an issue for appellate review, we would still consider whether there was a "substantial risk of a miscarriage of justice." *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967). In any event, even if the question were before us fully, the judge's ruling was not an abuse of discretion and that ruling did not unconstitutionally deny the defendant a fair trial. We see no substantial risk of a miscarriage of justice.

On the morning of the second day of his trial, in which the jury were not sequestered, the defendant told the judge that there has been publicity on at least one radio

station and in one Boston newspaper, mentioning murder
charges which were pending against him. The record does
not disclose what these news reports stated concerning
the defendant. We do not even have a copy of the alleged-
ly prejudicial newspaper article. We infer from the com-
ments of a juror who was discharged that the article
stated, at least, that the defendant had been indicted in
three separate counties on other charges. Although the
judge rejected the defendant's request for individual
questioning of the jurors, he asked the jury collectively
whether they had heard about the case on the radio or on
television during either of the first two days of the trial.
No juror responded affirmatively. When asked whether
they had seen anything about the case in an article in the
Boston Globe published on the second day of the trial,
thirteen of the sixteen empanelled jurors answered that
they had. The judge then asked if "anything that any
juror [had] seen in that article caused him or her to form
any opinion or prejudice against the defendant, or in rela-
tion to this case?" One juror answered in the affirmative.
He then asked if anything that any juror had read in that
article caused him or her to form any opinion which
would prevent him or her from rendering a fair and im-
partial verdict. The same juror answered in the affirma-
tive. No other juror answered in the affirmative. The
judge immediately instructed the jury not to read, listen
to, or discuss any media reference to the case, that cases
are decided on evidence in the courtroom, and that they
should ignore the newspaper article.[4] Out of the hearing
of the other jurors, the judge questioned the juror who
indicated that she had been affected by the newspaper
article, and then excused her.

---

[4] On the fifth day of the trial, the judge gave a similar instruction
to the jury. In his final charge to the jury, the judge instructed the jury
that anything they read outside the courtroom was not evidence, that
they must decide the case only on the evidence, that indictments are
not evidence in any respect, and that "[t]he defendant cannot be found
guilty upon suspicion or conjecture." The defendant did not except to
the judge's charge nor did he request further instructions.

The defendant was not denied his constitutional right to a fair trial. The Supreme Court of the United States, in the exercise of its supervisory powers, has adopted a stricter standard for Federal courts in cases involving potential juror prejudice than the constitutional standard which applies to State courts. Compare *Murphy* v. *Florida*, 421 U.S. 794, 797-798 (1975), with *Marshall* v. *United States*, 360 U.S. 310, 313 (1959).

The constitutional standard of fairness requires only that the jurors be impartial and indifferent. *Murphy* v. *Florida, supra* at 799. By this test, we see no constitutional violation. The record fails to disclose the allegedly prejudicial publicity. It appears that the newspaper article referred to serious charges pending against the defendant, but had no direct bearing on any contested issue in this case. The judge did not ignore the potential for prejudice. He made inquiry of the jury, discovered one juror who expressed a lack of impartiality due to the publicity, and discharged her after individual questioning out of the presence of the other jurors. The judge did not conduct a individual voir dire of each juror, but we do not see a threat to the fundamental impartiality of the jury in his failure to do so. The collective questioning of the jury brought forth one juror who conceded the prejudicial effect of the newspaper article on her. Any inhibitory effect of the collective questioning of the jury did not deter that juror, and her statements "broke the ice" for any other juror who might have been reluctant to identify him or her self as prejudiced. The judge gave prompt cautionary instructions and later repeated them.

The same reasoning which leads us to find no constitutional violation supports our further conclusion that the judge did not abuse his discretion in his handling of the asserted prejudicial publicity. We have heretofore granted trial judges wide discretion on this subject. See *Commonwealth* v. *Stanley*, 363 Mass. 102, 104-105 (1973); *Commonwealth* v. *Eagan*, 357 Mass. 585, 588-589 (1970). The circumstances of the *Eagan* case are quite similar to those in this case.

Although what we have said would dispose of the issue sought to be raised if it were properly before us, we exercise our power of general superintendence to set forth the procedures which should be followed hereafter when a claim of potentially extraneous influence on a jury is brought to the judge's attention after the jury are selected. We adopt prospectively the practice which has been followed in several Federal circuits. See, e.g., *United States* v. *Perrotta*, 553 F.2d 247, 249-250 (1st Cir. 1977). This practice seems indicated as a matter of public policy in light of G. L. c. 234, § 28, concerning specific questioning of individual jurors when certain potentially prejudicial circumstances may affect the jury selection process.[5]

When material disseminated during trial is reliably brought to the judge's attention, he should determine whether the material goes beyond the record and raises a serious question of possible prejudice. A number of factors may be involved in making that determination, including the likelihood that the material reached one or more jurors. See *United States* v. *Perrotta, supra* at 249. If the judge finds that the material raises a serious question of possible prejudice, a voir dire examination of the jurors should be conducted. The initial questioning concerning whether any juror saw or heard the potentially prejudicial material may be carried on collectively, but if any juror indicates that he or she has seen or heard the material, there must be individual questioning of that juror, outside of the presence of any other juror, to determine the extent of the juror's exposure to the material and its effects on the juror's ability to render an impartial

---

[5] The defendant made no claim below, and makes none here, that the judge's failure to conduct individual questioning of each juror was a violation of G. L. c. 234, § 28, as amended by St. 1975, c. 335. That statute is directed to the process of jury selection. See *Commonwealth* v. *Horton, ante* 380, 394-395 (1978). It does not prescribe the consequences of a failure to follow its terms. The rule of practice which we prescribe for the handling of potentially prejudicial circumstances arising during trial parallels that prescribed in G. L. c. 234, § 28.

verdict. See *United States* v. *Perrotta, supra* at 249-250; *United States* v. *Lord*, 565 F.2d 831, 838-839 (2d Cir. 1977); *Margoles* v. *United States*, 407 F.2d 727, 734 (7th Cir.), cert. denied, 396 U.S. 833 (1969). See also the even stricter requirements expressed in the ABA Standards Relating to Fair Trial and Free Press § 3.5 (f) (1968) as to material disseminated during trial, according to which all questioning should be conducted individually and a juror should be excused if he has been exposed to potentially prejudicial material which would furnish grounds for a mistrial if referred to in the trial itself, and *United States* v. *Herring*, 568 F.2d 1099, 1104-1105 (5th Cir. 1978).

*Judgments affirmed.*