**Anthony JACKSON, Petitioner, Appellant,**

v.

**Ronald AMARAL, Respondent, Appellee.**

**No. 83–1469.**

United States Court of Appeals, First Circuit.

Argued Nov. 8, 1983.

Decided March 8, 1984.

Robert S. Potters, Boston, Mass., with whom Nix & Potters, Boston, Mass., was on brief, for petitioner, appellant.

Barbara A.H. Smith, Chief, Criminal Appellate Div., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for respondent, appellee.

Before COFFIN, Circuit Judge, RO-SENN,* Senior Circuit Judge, and BREY-ER, Circuit Judge.

COFFIN, Circuit Judge.

The petitioner, Anthony Jackson, was convicted in a Massachusetts state court of various offenses including armed assault with intent to murder and unlawful carrying of a firearm. Jackson alleges that his constitutional rights were violated during the course of his trial and petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The District Court for the District of Massachusetts dismissed Jackson's petition. We affirm.

The facts supporting Jackson's conviction are reported in the opinion of the Supreme Judicial Court of Massachusetts, which is printed at 376 Mass. 790 and 383 N.E.2d 835 (1978). We see no need to repeat them here. Jackson raises two constitutional objections to his conviction. He argues that his waiver of counsel was inef-

fective and thus that he was deprived of his right to assistance of counsel. He also contends that the trial judge's refusal to voir dire individually all of the jurors exposed to prejudicial publicity during his trial deprived him of his right to an impartial jury.

### Waiver of Counsel

Jackson was indicted on the charges that led to his conviction in this case arising in Middlesex County in January, 1973. Jackson was not tried, however, for more than three years because his trial was postponed at his request pending resolution of an unrelated murder indictment in Suffolk County. Jackson was represented at the time of his indictment in this case by his own attorney, Steven Salon, and by appointed counsel, Jack Zalkind.

Jackson was represented in connection with the Suffolk County indictment by a succession of lawyers which evidently led Jackson, appearing pro se, to challenge the method used to appoint counsel and to object to the withdrawal of some of his counsel. The Supreme Judicial Court of Massachusetts rejected Jackson's petition on April 30, 1976, adopting a Master's Report that found that Jackson's trial had been delayed for three years by proceedings "initiated by (or in behalf of) Jackson and by his failure (a) to accept and work with assigned counsel, and (b) to keep those assigned willing to work with him". *Jackson v. Commonwealth*, 370 Mass. 855, 346 N.E.2d 714 (1976) (rescript opinion). The court concluded: "[i]f Jackson will not accept appointed counsel, he must proceed promptly to trial without counsel". 370 Mass. 856, 346 N.E.2d 714.

The Superior Court was thereafter instructed by the Chief Justice of Massachusetts to schedule other pending cases for trial, including this one, even though Jackson had not yet been tried on the Suffolk County indictment. As a pretrial hearing on June 3, 1976, both Salon and Zalkind moved to withdraw from this case, citing differences with Jackson as justification.

* Of the Third Circuit, sitting by designation.

The superior court judge granted their motion and scheduled trial for June 14, 1976.

During the course of that pretrial hearing Jackson indicated that he wished to appear pro se in this case. Jackson now contends that his waiver of counsel was ineffective because it was conditioned on the allowance of his request for more time to prepare for trial. Our review of the record indicates that Jackson "knowingly and intelligently" waived his right to counsel, *McKaskle v. Wiggins*, — U.S. —, —, 104 S.Ct. 944, 949, 79 L.Ed.2d 122 (1984); *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)), and that his waiver was unconditional.

It is clear from the record that Jackson waived his right to counsel with full knowledge that his trial had been scheduled for June 14, 1976. The superior court judge scheduled the trial for June 14 after allowing Zalkind to withdraw from the case, but before accepting Jackson's waiver. The judge, who was familiar with the April 30th opinion of the Supreme Judicial Court, informed Jackson that "in the case that I assigned for June 14, 1976, you will proceed with Mr. Salon or some other attorney appointed by this Court, either as [your attorney or] your legal advisor, if you decide to go pro se". This led to an extensive colloquy during which Jackson repeatedly objected to the scheduling of trial prior to the resolution of the murder charges against him.

The judge twice noted Jackson's objection to the scheduling of trial and then said: "Now, the next question I am asking you now that I have made the order to which you object and take an exception to [the June 14 trial date] is: Do you intend in any way to represent yourself, or do you want the assistance of legal counsel?" Jackson responded that "[i]f Mr. Salon decides that he chooses to withdraw ... then I will represent myself".

After further discussion during which Jackson again objected to the trial schedule and expressed concern about his lack of preparation and access to legal materials, the judge advised Jackson that the trial would go forward but that he would take his request for legal materials under advisement. The judge then advised Jackson that he had decided to appoint a legal advisor to assist him. Jackson responded that "Barry (sic) versus California says I have a right to try without legal counsel, without any assistance, without any attorney sitting at the table with me ...." The judge attempted to point out Jackson's lack of legal training, but Jackson responded that "the last statement of the decision says that: we bestow on the defendant the right to defend himself—although one who defends himself may have a fool for a client. And I ask the Court for that right. If I must sail the sea, I want to be at the helm of my own ship, Your Honor, without counsel". Subsequently the judge allowed Mr. Salon to withdraw from the case, but he assigned counsel to act as Jackson's legal advisor.

On this record we have no difficulty concluding that Jackson's waiver of legal counsel was "intelligent, effective, and voluntary". *Fillippini v. Ristaino*, 585 F.2d 1163 (1st Cir.1978). We agree with the Supreme Judicial Court that Jackson was "literate, competent, and understanding", 383 N.E.2d at 839 (quoting *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975)), and that he was "adequately aware of the seriousness of the charges, the magnitude of his undertaking, the availability of advisory counsel, and the disadvantages of self-representation", 383 N.E.2d at 839. Nor do we have any doubt that his waiver was unconditional. The record clearly indicates that the trial date of June 14 was firmly fixed before Jackson indicated his desire to proceed pro se and there is no indication that Jackson ever conditioned his waiver on the grant of a continuance.

### Voir Dire

On the morning of the second day of Jackson's trial an article appeared in The Boston Globe, which reported that Jackson

had been indicted for murder in three Massachusetts counties. When Jackson brought this report to the attention of the court and claimed that he had been prejudiced by it, the court agreed to conduct a voir dire of the jury to ascertain the impact, if any, of the publicity.

Although Jackson requested that the court question the jurors individually, the court decided to address its initial questions to the jury collectively. Thirteen of the sixteen jurors indicated that they had read the Boston Globe article. But only one of the thirteen jurors responded affirmatively when the court asked if anything in the article had caused any of them "to form any opinion or prejudice against the Defendant". Nor did any other juror respond affirmatively when the court asked if the article would prevent them from rendering a fair and impartial verdict.

Following these questions the court instructed the jurors to ignore the Globe article and other press accounts and reminded them of their duty to decide the case in a fair and impartial manner solely on the basis of the evidence presented at trial. The court then conducted a separate voir dire of the juror who had answered affirmatively and excused her from further service.

Jackson contends that the court's failure to voir dire individually all of the jurors who saw the Globe article deprived him of his constitutional right to trial by an impartial jury. The respondent argues both that Jackson is precluded from bringing this claim and that the court conducted a proper and constitutionally adequate voir dire. We reject the state's procedural claim, but conclude that the collective voir dire did not deprive Jackson of his constitutional rights.

During the course of trial Jackson lodged a timely objection to the court's refusal to conduct an individual voir dire of the jurors who saw the Globe article. In his brief to the Supreme Judicial Court Jackson pressed this failure as one of his three grounds of appeal. But the Supreme Judicial Court held that this claim was not properly before it, because it had not been properly identified in Jackson's "Assignment of Errors" before the state appeals court. Nevertheless, the Supreme Judicial Court proceeded to consider the merits of Jackson's claim to ascertain "whether there was a 'substantial risk of a miscarriage of justice'". 383 N.E.2d at 840 (quoting *Commonwealth v. Freeman*, 352 Mass. 556, 563–64, 227 N.E.2d 3 (1967)). The court concluded that Jackson "was not denied his constitutional right to a fair trial", but speaking pursuant to its supervisory power the court indicated that in the future it would expect state judges to conduct an individual voir dire in similar circumstances. 383 N.E.2d at 841.

The state urges us to follow the rule adopted in some other circuits, *e.g. United States ex rel. Spurlark v. Wolff*, 699 F.2d 354 (7th Cir.1983) (en banc); *Forman v. Smith*, 633 F.2d 634 (2d Cir.1980), and to apply on collateral review the same "cause" and "prejudice" standard to appellate procedural defaults as is applied to trial level defaults, *see e.g., Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d (1971); *McCown v. Callahan*, 726 F.2d 1 (1st Cir.1984). Whatever the merits of such an approach, we find no need to declare our position in this case because we believe that the state effectively waived Jackson's minor appellate procedural default.

■ Although the Supreme Judicial Court noted that Jackson had failed to properly raise his voir dire claim on appeal, it fully addressed the merits of his argument, discussing a number of federal constitutional cases in the process. The court squarely held that "[E]ven if the question were before us fully, the judge's ruling was not an abuse of discretion and that ruling did not unconstitutionally deny the defendant a fair trial." 383 N.E.2d at 840. We believe that the court's discussion of Jackson's federal constitutional rights indicates that the court waived Jackson's procedural default to an extent sufficient to allow us to undertake collateral review.

In a recent decision, *McCown v. Callahan*, 726 F.2d 1 (1st Cir.1984), we recog-

nized that a state may conduct "miscarriage of justice" review without waiving any procedural bar to collateral review. The test, according to *McCown*, is the extent to which the state court relies upon federal rights, cases and legal principles in conducting its review. At 3–4. *See also Gibson v. Butterworth*, 693 F.2d 16, 17 (1st Cir.1982) (holding that miscarriage of justice review did not waive the petitioner's procedural default because the court's "examination of the merits went not to the *federal* question ..., but to the *state* law question ..." (emphasis original)). The greater the reliance on federal doctrine, the more likely we are to find waiver. Since the constitutional analysis of the Supreme Judicial Court rested exclusively on *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), we find that the state waived Jackson's procedural defect.

This conclusion is of course consistent with the policy underlying the decision in *Wainwright*. As we noted in *McCown*, "if the state courts do not 'indicate that a federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the state by entertaining the claim'". At 3 (quoting *Ulster County Court v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1978)).

Coming to the merits, we hold that the trial court's failure to individually voir dire the jurors did not violate Jackson's right to trial by an impartial jury. Although we have declared that jurors exposed to potentially prejudicial publicity during the course of trial should be individually questioned to ensure that they remain capable of rendering a fair and impartial verdict, *United States v. Perrotta*, 553 F.2d 247, 249–50 (1st Cir.1977), our directive was based on our supervisory authority over the federal courts rather than on the Constitution. Indeed, we expressly noted in that opinion that "[w]e specifically refrain from making any statement concerning what practices the Constitution might mandate in state criminal trials". 553 F.2d at 250 n. 5.

■ Since the Constitution does not require an individual voir dire of all jurors exposed to potentially prejudicial publicity, *see Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976); *Murphy v. Florida*, 421 U.S. 794, 797–98, 95 S.Ct. 2031, 2034–35, 44 L.Ed.2d 589 (1975); *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam); *Salemme v. Ristaino*, 587 F.2d 81, 88 (1st Cir.1978), we may reverse Jackson's conviction only if there is reason to believe that the exposure of the jurors to the Globe article was "so prejudicial that it render[ed] a fair trial impossible". *Lagasse v. Vestal*, 671 F.2d 668, 669 (1st Cir.1982) (citations omitted).

■ The trial judge carefully questioned the jurors about the effect of the Globe article on their attitude towards the defendant and repeatedly emphasized to the jurors the importance of ignoring press accounts and of deciding the case solely on the basis of the evidence presented at trial. On the final day of trial, for instance, he warned the jurors that "[t]hings that you have seen, read, heard about outside of this Court are not evidence and may not be considered by you", and he repeatedly emphasized that "the defendant [can] be found guilty ... only upon solid evidence produced in court".

As the Supreme Court of Massachusetts recognized in this case, an individual voir dire is more likely to reveal juror bias or prejudice than a collective voir dire. Nevertheless, we can not say that the judge's questions and instructions in this case were constitutionally inadequate. That the judge's collective voir dire led one juror to publicly question her impartiality indicates that the voir dire was not wholly ineffective and suggests that any other juror who doubted his or her ability to render an impartial verdict would have felt comfortable in stepping forward. Whatever the weakness of the procedure employed by the trial court, we cannot say that it deprived the trial of "that fundamental fairness essential to the very concept of justice". *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941).

*The district court's judgment denying the petition for writ of habeas corpus is affirmed.*