NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11686

COMMONWEALTH  vs.  ASIM AMRAN.


Worcester.     February 6, 2015. - April 30, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Hines, JJ.


Homicide.  Evidence, Photograph, Inflammatory evidence.  Jury
    and Jurors.  Practice, Criminal, Capital case, Mistrial,
    Instructions to jury, Assistance of counsel, Jury and
    jurors, Deliberation of jury, Voir dire.



    Indictment found and returned in the Superior Court
Department on November 20, 2009.

    The case was tried before Janet Kenton-Walker, J.


    Leslie W. O'Brien for the defendant.
    Stephen J. Carley, Assistant District Attorney, for the
Commonwealth.


    SPINA, J.  The defendant was convicted of killing his wife

with deliberate premeditation.  On appeal he alleges error in

(1) the admission of photographs prejudicially depicting the

victim's body in an advanced state of decomposition, and lacking

any relevance to any issue at trial; (2) the failure to grant a

mistrial after the medical examiner testified that the victim's

death was a homicide, when the defense was that it was a suicide; (3) the admission of the defendant's statement to police with no redactions of (i) inadmissible accusations by police, (ii) assertions that police had inculpatory evidence that was not presented to the jury, and (iii) hearsay; and (4) the failure to conduct a voir dire of jurors after at least one juror had been exposed to prejudicial extraneous material. We affirm the conviction and decline to exercise our powers under G. L. c. 278, § 33E.

1. Background. The jury could have found the following facts. We reserve additional details for discussion of particular issues. The defendant and the victim were married in Pakistan in 2003 or 2004. The marriage was arranged by the defendant's family. Shortly after the marriage, the defendant, an American citizen, returned to the United States with the victim. She spoke no English and did not drive. She was entirely dependent on the defendant's family for companionship and transportation. The couple had a son with whom the victim was very close.

The couple came under stress after the defendant lost a lucrative job. They began arguing and discussed separating. In 2008, their financial circumstances forced them to move to an apartment owned by the defendant's parents in Fitchburg. That year the defendant obtained employment as a staff nurse at a

nursing home in Tewksbury. One of his responsibilities included administering medications, including morphine, to residents of the nursing home. The system used by the nursing home to account for medicating residents did not track the actual administration of the medications. That is, it did not account for a staff member who kept the medication rather than give it to the resident.

During the fall of 2008 the defendant met a woman, Sara, at a Worcester nightclub. After about one month they started a relationship. He occasionally stayed at her apartment, and he began supporting her. The defendant's wife learned of his affair, and their marriage further deteriorated. She confided in her sister-in-law, with whom she was close, often crying, and expressing feelings of depression and a desire to take her own life. She contacted a homeopathic doctor in Virginia.

On December 31, 2008, Sara told the defendant that he had to choose between her and the victim by the end of that day. He went home, where he and the victim argued. After, he left and took their three year old son with him. They went to Sara's apartment. He told Sara, who had a young son of her own, "That's your son. You have two kids now." The defendant stayed at Sara's apartment that night. When she awoke he was gone. She reached him by telephone. He told her the victim was drunk and he was taking care of her. At about noon Sara again

telephoned him. He said he was on his way, but it would take some time because of a bad storm. He arrived at Sara's apartment at about 4:30 P.M. The defendant said the victim had gone to his aunt's house in Virginia.

On January 2 or 3, 2009, one of the defendant's brothers learned that the victim was missing. Some of her relatives had been concerned and tried unsuccessfully to contact her. The defendant's brother went to the defendant's and victim's apartment and saw "a lot of stuff moved around." On January 4 a Fitchburg police detective went to the defendant's apartment to investigate a missing persons report concerning the defendant's wife and son. He noticed the apartment was neat, with the exception of the den, which was in total disarray. The detective asked the defendant to come to the police station for an interview. Later that day the defendant went to the Fitchburg police station with his son. He told the detective he and his wife were constantly arguing, and she had left him. He said she had gone to Virginia.

The defendant gave several inconsistent accounts of his wife's absence to various people. He told one brother she had moved to Florida and he would join her in the near future. He told another brother that she disappeared and he had no idea where she was. He told an investigator with the Department of Children and Families that his wife had left him for another man

around January 1 and her family suspected she was in Virginia. The victim's family tried for months to locate her. The State police became involved, and that investigation also lasted months.

Sara repeatedly questioned the defendant about the victim. He eventually told her that he caused the victim to become unconscious, then cut her, and put her in a suitcase. He showed Sara the traffic rotary in Oxford where he had disposed of the body. On August 17, 2009, Sara spoke with police and showed them where the defendant had disposed of the victim's body. Police recovered the body from the bottom of an embankment.

An autopsy revealed that the victim's remains were in an advanced state of decomposition. There was no evidence of trauma to the body, but laboratory results indicated the presence of morphine. The precise cause of death could not be determined due to the extent of decomposition, but there was still sufficient morphine to cause death.

On August 20, 2009, police executed a search warrant at the defendant's apartment in Fitchburg. Various medications and pills were seized, including three tablets containing morphine. The defendant was arrested. On September 17, 2009, the defendant telephoned Sara from the jail where he was being held. He instructed her to contact one of his brothers, who had a letter for her. Police searched the brother's home and

retrieved a letter purporting to be Sara's confession, describing how she had poisoned the victim with morphine. The letter was in the defendant's handwriting. He had instructed his brother to have Sara copy it in her handwriting.

The defendant testified at trial. He described the deterioration of his marriage and his relationship with Sara. He testified that on the morning of December 31, 2008, his wife was asleep and there were empty pill bottles in their apartment. When he checked on her later, she had died. He tried unsuccessfully to revive her. He did not call for help because he believed he would be suspected of causing his wife's death, citing the facts that he was a cheating husband, a former Marine, and a nurse. He brought his son to Sara's apartment. He testified that he told Sara what happened and they discussed the need to get rid of the victim's body. He returned to his apartment, wrapped the victim's body in plastic, and placed it in a suitcase. He drove to Oxford and threw the body over the side of a road. The defendant said he had lied to police because he thought they would not believe the truth. The defendant said that he wrote the letter for Sara to copy before he received the autopsy report, and only guessed as to what drugs were in the victim's body.

2. _Photographs of the victim's body_. The defendant argues that the admission in evidence of two postmortem photographs of

the victim's body in an advanced state of decomposition was prejudicial, with no offsetting probative value related to any issue in the case.  One of the photographs depicts the body as it was found in a suitcase, in a fetal position wrapped in plastic.  The other photograph depicts the body on the autopsy table.  The defendant objected, so we review under the prejudicial error standard.  See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).  "The question whether the inflammatory quality of a photograph outweighs its probative value and precludes its admission is determined in the sound discretion of the trial judge."  Commonwealth v. Pena, 455 Mass. 1, 12 (2009), quoting Commonwealth v. DeSouza, 428 Mass. 667, 670 (1999).

The resolution of this issue is controlled by Commonwealth v. Nadworny, 396 Mass. 342, 366-367 (1985), cert. denied, 477 U.S. 904 (1986).  In that case, we affirmed the admission of similar photographs, reasoning that "the state in which the body was found, bound into a position [and wrapped in a plastic bag] which would best effectuate transportation and concealment, as well as its advanced state of decomposition, was evidence of malice and consciousness of guilt and thus probative of guilt. Moreover, the pictures were relevant to assist the jury in understanding the pathologist's testimony, particularly as to the fact that the decomposition prevented establishing precise cause and time of death."  Id.

The judge took measures to mitigate any potential prejudice from the two photographs by alerting the venire during jury selection that graphic photographs might be admitted in evidence, and she asked potential jurors if that might cause anyone particular difficulty. She excused potential jurors who responded affirmatively. The judge prohibited the Commonwealth from displaying the photographs on a high-resolution video screen, and invited jurors who did not wish to view the photographs to pass them along. She cautioned the jury four times that the photographs were only to be considered for "clinical" and "medical issues," "the nature of the injuries, or the nature of the incident itself," and not "to evoke sympathy or emotion" for the deceased. She also limited the Commonwealth to two postmortem photographs. The judge proceeded with the degree of care and special attention that we have recommended for the admission of such photographs. See Commonwealth v. Cardarelli, 433 Mass. 427, 432 (2001); Commonwealth v. Vizcarrondo, 431 Mass. 360, 362-363 & n.2 (2000); Nadworny, 396 Mass. at 367. There was no abuse of discretion.

3. Motion for mistrial. Defense counsel filed a motion in limine that sought to prevent the medical examiner from testifying, as he had before the grand jury, that the cause of death was "homicide, poisoned by another, [and] homicidal violence." The prosecutor had argued that the medical examiner

at least should be permitted to testify that in his opinion the victim was "poisoned by another." The judge expressed doubt that "poisoned by another" would be admissible, but she allowed for the possibility that an opinion as to "morphine poisoning" might be admissible. She deferred action on the motion until she heard the medical examiner's testimony as it developed. At trial, when asked for his opinion as to cause of death, the medical examiner said "homicidal violence." Defense counsel immediately objected and moved for a mistrial. There was no suggestion that the prosecutor knowingly elicited that opinion. The judge denied the motion for a mistrial but said she would strike the answer and give a curative instruction to the effect that the doctor's answer was beyond his area of expertise and must be disregarded. Trial counsel did not object, and indicated that the judge's proposed curative instruction was acceptable.

The judge instructed the jury immediately after the sidebar conference that the doctor's answer with respect to "homicide" was struck and that they must disregard it. She explained that the doctor was qualified to give an opinion as to the cause of death in medical terms, but he could not testify that the victim's death was a homicide. She further explained that the method by which death occurred was a question reserved for the jury. The defendant did not object to the curative instruction

or request any further instruction.  The defendant now argues that the curative instruction was inadequate to cure the prejudice interjected by the medical examiner, and that the judge abused her discretion in denying the motion for a mistrial.

"A trial judge retains broad discretion in deciding whether to declare a mistrial, and this court should defer to that judge's determination of whether [there was] prejudicial error, how much any such error infected the trial, and whether it was possible to correct that error through instruction to the jury." Commonwealth v. Thomas, 429 Mass. 146, 157 (1999).  This court has said that the term "homicide" implies no liability in law. See Commonwealth v. Lannon, 364 Mass. 480, 483 (1974).  However, its use by the medical examiner here, particularly where the defense was suicide, probably created the impression that death was brought about by criminal means.  This was an impermissible expression of opinion that intruded on the function of the jury. See id. at 483-484.  A trial judge is in the best position to determine whether a mistrial, an extreme measure available to a trial judge to address error, is necessary, or whether a less drastic measure, such as a curative instruction, is adequate. See Commonwealth v. Costa, 69 Mass. App. Ct. 823, 826-827 (2007); Commonwealth v. Riberio, 49 Mass. App. Ct. 7, 10-11 (2000).

Where the judge promptly struck the improper testimony and gave a highly specific curative instruction, the judge acted appropriately and within her discretion. See Commonwealth v. Chubbuck, 384 Mass. 746, 753 (1981); Costa, supra. The curative instruction was acceptable to very experienced defense counsel, which is some indication of its effectiveness. Moreover, the medical examiner had been unable to articulate a precise cause of death due to the advanced state of decomposition. The jury are presumed to follow the judge's instruction, Commonwealth v. Mendes, 441 Mass. 459, 470 (2004), and we see no reason to think otherwise.

Finally, the judge instructed the jury in her final instructions, five times, that the Commonwealth had to prove beyond a reasonable doubt that the defendant caused the victim's death, that it was not an accident, that he intended to kill the victim, and that the defendant acted with deliberate premeditation. She also reminded the jury that they were not to consider any matter that she had struck and told them to disregard. We are satisfied that any potential prejudice that flowed from the medical examiner's testimony was neutralized by the judge's careful attention and her curative instruction.

4. Defendant's statement. The defendant had given a statement to two State police officers that was video recorded and shown to the jury. A transcript of the statement was

provided to each juror.  Portions of the interview contain numerous accusations that he was lying to the officers, statements by the officers implying they had inculpatory evidence beyond that presented to the jury, and hearsay statements that violated his right of confrontation.  The defendant now argues that those portions should have been redacted.

In Commonwealth v. Santos, 463 Mass. 273, 288-289 (2012), we held that admission of interrogating officers' frequent accusations that the defendant was lying during a recorded statement played to the jury ran afoul of the fundamental principle that a witness cannot be asked to assess the credibility of his testimony or that of other witnesses.  Id., citing Commonwealth v. Dickinson, 394 Mass. 702, 706 (1985).  Similarly, "[o]pinions of the interrogating detectives that the defendant is guilty and lying . . . and police reiteration of accusations by third parties that the defendant has denied, are not admissible."  Commonwealth v. Spencer, 465 Mass. 32, 48-49 (2013).  It is improper for a Commonwealth witness to imply that he or she possesses inculpatory information beyond what the jury has heard.  Cf. Commonwealth v. Meuse, 423 Mass. 831, 832 (1996) (improper for prosecutor to imply he has special knowledge concerning information not presented at trial).  Finally, admission of testimonial statements of persons who did not

testify and who were not subject to cross-examination generally is proscribed by the Sixth Amendment to the United States Constitution. See Crawford v. Washington, 541 U.S. 36, 57-59 (2004). The defendant did not object to the admission of the portions of his statement he now asserts should not have been presented to the jury. We review to determine if any error created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992). We conclude that it did not.

Had an objection been made, there is no question that the portions complained of should have been redacted. There is also no question that trial counsel did not object because the unredacted portions of the defendant's interview figured prominently in the theory of the defense. The defendant maintained his innocence, he contended that his wife had committed suicide, he realized no one would believe that he did not kill her, and the portions of his interview that he now argues should not have been admitted were relied on by trial counsel to support his theory of police bias and his Bowden attack on the integrity of the police investigation. See Commonwealth v. Bowden, 379 Mass. 472, 485-486 & n.7 (1980). Trial counsel informed the jury of the defense in his opening statement. At the time the Commonwealth sought to offer the video recording of the defendant's interview, trial counsel had

agreed to redact several portions (references to ownership of a gun, a polygraph examination, and his brother's criminal history), but not those portions in question. The portions of the video recording in question were admitted in evidence and played to the jury by express agreement. The defendant maintained his innocence throughout the three and one-half hour interview with two State police officers under blistering accusations that he was lying.

Trial counsel cross-examined one of the two interrogators, reminding him of his assertion in the video recording about keeping "an open mind." The trooper acknowledged that he was unaware if anyone had interviewed the defendant's relative with whom the victim was closest, or whether the victim had seen a doctor for depression. Trial counsel specifically advised the judge that the purpose of his inquiry was to call into question the integrity of the police investigation, pursuant to Bowden. The judge, in her final instructions to the jury, at the request of trial counsel, gave a Bowden instruction. Contrast Commonwealth v. Lao, 460 Mass. 12, 22-23 (2011) (we have stated on many occasions that judge is not required to instruct on claimed inadequacy of police investigation under Bowden).

In his closing argument, trial counsel forcefully drove home the many points he had made, integrating the now challenged portions of the video recording with evidence that had been

admitted that supported the defense theory that the victim's death was a suicide, and that police had rushed to judgment, just as the defendant had feared.  By allowing the jury to see the contested portions of the interview, trial counsel was able to present the defendant as someone who consistently admitted that he made a mistake in judgment by not contacting the police when he discovered his wife had died, but who steadfastly maintained his innocence.  The defense was well conceived, well considered, and well anchored in the evidence.

The decision of trial counsel to agree to the admission of otherwise inadmissible evidence that supported the defense was a conscious strategic decision that was not unreasonable at the time it was made.  We have recognized the validity of such a strategy on many occasions.  See, e.g., Commonwealth v. Johnston, 467 Mass. 674, 692-693 (2014); Commonwealth v. Clemente, 452 Mass. 295, 327 (2008), cert. denied, 555 U.S. 1181 (2009); Commonwealth v. Cutts, 444 Mass. 821, 831 (2005); Commonwealth v. Squailia, 429 Mass. 101, 110-111 (1999); Commonwealth v. Adams, 374 Mass. 722, 728 (1978).  We conclude there was no error, i.e., ineffective assistance of counsel, much less a substantial likelihood of a miscarriage of justice. Wright, 411 Mass. at 682.

5.  Extraneous influence.  As previously mentioned, some portions of the defendant's statement concerning his ownership

of a gun, the results of a polygraph examination he had taken, and his brother's criminal history were redacted from the video recording admitted in evidence and played to the jury. The jurors were provided a transcript of the video recording. When the jurors began their deliberations, those transcripts as well as the exhibits went with them. During the morning of the second day of deliberations the foreperson sent a note to the judge informing her that four numbered pages of one juror's transcript contained text, but the same numbered pages in the other jurors' transcripts were blank. The note indicated that the four pages in question had not been discussed. The pages in question contain references to the defendant's ownership of a gun, and a reference to the defendant's polygraph examination -- with a comment that he "didn't do well." The four pages in question constituted material that the parties had agreed would be redacted from the transcripts, and had been redacted from the video recording.

The judge proposed speaking first with the foreperson to determine the identity of the juror who had the unredacted transcript, and whether any other jurors were affected. The parties agreed to this procedure. After questioning both the foreperson and juror no. 10, whose transcript was unredacted, the judge determined that only juror no. 10 had an unredacted transcript, that juror no. 10 only read the first line of the

pages in question, that no other juror had been exposed to the pages in question, and that the material in question was neither shared nor discussed among the jurors. The only line read by juror no. 10, states: "Sergeant Nanof: Do you own a gun?" The judge found that "there was no extraneous influence on the jury as a whole," and to the extent that juror no. 10 had only read the first line, there was "no extraneous influence on the juror" either. The defendant, in consultation with trial counsel, was satisfied with the judge's resolution and that it was appropriate. The defendant also agreed with trial counsel's recommendation not to move for a mistrial and not to move to replace juror no. 10 with an alternate juror.

The defendant argues that the judge erred by failing to conduct a voir dire either individually or collectively after it became clear that at least one juror had been exposed to extraneous material. He relies primarily on Commonwealth v. Tennison, 440 Mass. 553, 557-558 (2003), where we reaffirmed the procedure prescribed in Commonwealth v. Jackson, 376 Mass. 790, 800 (1978), for judges to follow when a claim of extraneous influence on a jury is brought to their attention. That procedure requires "[t]he judge [to] first 'determine whether the material . . . raises a serious question of possible prejudice.' [Jackson, supra.] If the judge so determines, he or she should conduct a voir dire examination of the jurors.

Id.  This initial voir dire may be conducted collectively, but if, in fact, a juror indicates exposure to the extraneous material in question, an individual voir dire is required to determine the extent of that exposure and its prejudicial effect.  Id."  Tennison, supra, quoting Jackson, supra.  In Tennison, we also observed that "[t]he trial judge has discretion in addressing these issues, and we must give deference to [her] conclusions."  440 Mass. at 558, citing Commonwealth v. Francis, 432 Mass. 353, 369-370 (2000).  "The facts of the specific case are important," and we review the judge's procedure for an abuse of discretion.  Francis, supra at 370, quoting Commonwealth v. Kamara, 422 Mass. 614, 616 (1996).

The judge was entitled to rely on the answers of the foreperson and juror no. 10 to the questions she asked.  See Commonwealth v. Coleman, 389 Mass. 667, 676 n.7 (1983).  It was apparent from the voir dire of those jurors that the only person exposed to the four unredacted transcript pages was juror no. 10, and that juror no. 10 had only read the first line, which was merely a question by one of the interrogators.  The judge acted within her discretion when she determined that juror no. 10 had not been a source of extraneous influence on the other jurors, and that the material to which juror no. 10 had actually been exposed supported a finding that there was no serious question of possible prejudice that required a voir dire of

other jurors.  See Francis, supra.  See also Commonwealth v. Maldonado, 466 Mass. 742, 761, cert. denied, 134 S. Ct. 2312 (2014).

6.  G. L. c. 278, § 33E.  We have reviewed the entire record and the briefs, and discern no reason to reduce the verdict or order a new trial.

Judgment affirmed.